[939 NYS2d 321]

VOOM HD Holdings LLC, Respondent, v EchoStar Satellite L.L.C., Appellant.

First Department, January 31, 2012

34

**APPEARANCES OF COUNSEL**

*Simpson Thacher & Bartlett LLP*, New York City (*Roy L. Reardon, Blake A. Bell* and *Ryan A. Kane* of counsel), and *Morrison & Foerster LLP*, New York City (*Charles L. Kerr, Ronald G. White* and *J. Alexander Lawrence* of counsel), for appellant.

*Gibson, Dunn & Crutcher LLP*, New York City (*Orin Snyder* and *Alma Asay* of counsel), for respondent.

*Goldberg Segalla LLP*, Buffalo (*John J. Jablonski* of counsel), for amicus curiae.

**OPINION OF THE COURT**

MANZANET-DANIELS, J.

This case requires us to determine the scope of a party's duties in the electronic discovery context, and the appropriate sanction for failure to preserve electronically stored information (ESI). We hold that in deciding these questions, the motion court properly invoked the standard for preservation set forth in *Zubulake v UBS Warburg LLC* (220 FRD 212 [SD NY 2003]; *Pension Comm. of Univ. of Montreal Pension Plan v Banc of Am. Sec.*, 685 F Supp 2d 456, 473 [SD NY 2010]), which has been widely adopted by federal and state courts. In *Zubulake*, the federal district court stated, "Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents" (*Zubulake*, 220 FRD at 218). The *Zubulake* standard is harmonious with New York precedent in the traditional discovery context, and provides litigants with sufficient certainty as to the nature of their obligations in the electronic discovery context and when those obligations are triggered.

VOOM HD (Voom) is a Delaware limited liability company owned by Rainbow Media Holdings LLC, which, in turn, is owned by the public company Cablevision Systems Corporation. EchoStar is a provider of direct broadcast satellite television services through its "DISH Network," using a satellite distribution system to deliver to subscribers digital television programming licensed from owners of programming services.

On November 17, 2005, Voom and EchoStar entered into an "affiliation agreement," a 15-year contract whereby EchoStar agreed to distribute Voom's television programming. The agreement required EchoStar to include the Voom channels "as part of its most widely distributed package of HD programming services"—i.e., EchoStar could not "tier" the channels and charge its customers more for Voom than the standard fee charged to customers for HD. EchoStar had the right to terminate the agreement if Voom failed to spend $100 million on the "service" in any calendar year, and retained the right to audit Voom's expenses and investments.

Voom contends that in mid-2007 EchoStar determined that the deal was disadvantageous, and therefore decided to falsely claim that Voom had fallen short of its financial commitment in 2006 or had failed to meet its programming content obligations. EchoStar allegedly sought to terminate the contract or to "tier"

Voom's channels; under either scenario, Voom insists it stood to lose billions of dollars. Voom also charges that EchoStar made the related decision in mid-2007 to remove Voom's channels from its most widely distributed HD channel package.

At a meeting in June 2007, Carl Vogel, EchoStar's vice chairman, purportedly stated that the high cost of Voom "did not fit Echostar's market position as the low-cost video provider," and that the deal was a "mistake" by prior senior management. Eric Sahl, senior vice-president of programming called the agreement a "lead balloon," noting that Voom's cost was outweighing its value because Voom was not driving enough HD subscribers to justify Voom's high price.

On June 19, 2007, Carl Vogel, EchoStar's vice chairman, told his subordinates: "If [Voom doesn't] give us the free programming can we tier them? What are the breach remedies? I need a full summary of what we can do today." "Trigger the audit now. Given their balance sheet there is no way they've met the commitment . . . Prepare the breach notice."

On June 19, 2007, Kevin Cross, EchoStar's senior corporate counsel, sent a letter advising Voom of its intent "to avail itself of its audit right[s]."

The following day, June 20, 2007, Cross sent a second letter to Voom, expressing EchoStar's "belie[f] that Voom failed to spend $100 million on the Service in calendar year 2006," and that "EchoStar is thus entitled to terminate the Agreement," and reserving EchoStar's "rights and remedies."

On July 10, 2007, Vogel directed an EchoStar executive to "[d]raft the breach letter."

On July 11, 2007, Voom sent EchoStar an "Analysis," showing its expenditure of $102,959,000 in 2006. On July 12, 2007, Carolyn Crawford, EchoStar's vice-president for programming, forwarded Voom's breakdown of its spending to Vogel and Sahl, describing it as "indicat[ing] a $102.9 m spend for 2006," and reported that EchoStar "will likely need to lean on the audit lever to accomplish either termination rights . . . or tiering rights."

On July 13, 2007, Cross sent letters to Voom claiming "material breaches" of contractual programming content requirements, and reserving EchoStar's "rights and remedies in equity or at law."

On July 23, 2007, according to EchoStar's own privilege log, EchoStar's executives began consulting with in-house litigation

counsel, Jeffrey Blum, regarding the agreement and the dispute with Voom.

On July 27, 2007, Cross sent another letter rejecting Voom's compliance with content provisions, accusing Voom of "material breaches" of the agreement, and reserving EchoStar's "rights and remedies in equity or at law."

By July 31, 2007, Voom became "extremely concerned" that the matter was going to be litigated and implemented a litigation hold, including automatically preserving e-mails.

On September 27, 2007, Vogel reminded his executives of the "need to declare [Voom] in default on the content covenants as well [as the $100 million investment]." Crawford responded by advising Vogel that "[w]e are using both the content covenant breach and the concern about the $100m investment requirement as leverage to get a tiering deal done."

During October 2007, EchoStar conducted an audit of Voom's 2006 investment in the service. On October 26, 2007 EchoStar's own auditor concluded, in an e-mail sent to Crawford, that "[e]verything at Voom looks fine . . . these guys are clean . . . very organized, forthcoming, and from an accounting perspective run a good shop."

On October 23, 2007, days earlier, EchoStar executives began discussing "potential litigation" with Blum. According to EchoStar's privilege log, these conversations continued through the date that Voom filed suit.

Undeterred by the findings of its own auditor, EchoStar, on November 16, 2007, sent another breach letter, threatening "to terminate the Agreement, effective immediately" if Voom did not agree that, "beginning February 1, 2008, . . . ongoing carriage would be on a 'tiered' basis, as determined by EchoStar in its discretion." On December 4, 2007, Voom responded, "[W]e don't agree with your claims/assertions of breach/proposed actions" and suggested a meeting to resolve the issue. Voom maintained that the contemplated re-tiering, without its consent, was a plain violation of the parties' agreement.

On January 23, 2008, Crawford sent an e-mail to Sahl stating that EchoStar was proceeding with "the plan for a full termination."

By letter dated January 28, 2008, Voom protested that EchoStar had no right to terminate the affiliation agreement and rejected EchoStar's proposed re-tiering.

On January 30, 2008, EchoStar formally "terminate[d] the Agreement effective February 1, 2008." Voom commenced this

action the next day. EchoStar did not implement a litigation hold until after Voom filed suit. Yet this purported "hold" did not suspend EchoStar's automatic deletion of e-mails. Thus, any e-mails sent and any e-mails deleted by an employee were automatically and permanently purged after seven days. It was not until June 1, 2008—four months after the commencement of the lawsuit, and nearly one year after EchoStar was on notice of anticipated litigation—that EchoStar suspended the automatic deletion of relevant e-mails.

The e-mails described above, from September 27, 2007 and January 23, 2008—reflecting EchoStar's intention to terminate the agreement unless Voom agreed to be tiered—were only produced due to the fortunate circumstance that they were captured in unrelated "snapshots" of certain executives' e-mail accounts taken in connection with *other litigations*. Voom moved for spoliation sanctions, arguing that EchoStar's actions and correspondence demonstrated that it should have reasonably anticipated litigation prior to Voom's commencement of this action.

The motion court granted Voom's motion for spoliation sanctions (2010 NY Slip Op 33759[U] [2010]). The court found that

> "EchoStar's concession that termination would lead to litigation, together with the evidence establishing EchoStar's intent to terminate, its various breach notices sent to VOOM HD, its demands and express reservation of rights, all support the conclusion that EchoStar must have reasonably anticipated litigation prior to the commencement of this action" (2010 NY Slip Op 33759[U], *30).

The court, citing *Zubulake*, concluded that EchoStar should have reasonably anticipated litigation no later than June 20, 2007, the date Kevin Cross, its corporate counsel, sent Voom a written letter containing EchoStar's express notice of breach, a demand, and an explicit reservation of rights. The court found that EchoStar's subsequent conduct also demonstrated that it should have reasonably anticipated litigation prior to the filing of the complaint, citing correspondence during the summer and fall of 2007, and EchoStar's own privilege log, which showed that EchoStar designated documents as "work product" relating to "potential litigation" with Voom as early as November 16, 2007, the date of the EchoStar breach letter to Voom.

The court observed that in addition to failing to preserve electronic data upon reasonable anticipation of litigation, no

steps whatsoever had been taken to prevent the purging of e-mails by employees during the four-month period after commencement of the action. EchoStar continued to permanently delete employee e-mails for up to four months after the commencement of the action, relying on employees to determine which documents were relevant in response to litigation, and to preserve those e-mails by moving them to separate folders. As the court put it: "EchoStar's purported litigation hold failed to turn off the automatic delete function, and merely asked its employees—many of whom, presumably were not attorneys—to determine whether documents were potentially responsive to litigation, and to then remove each one from EchoStar's pre-set path of destruction" (2010 NY Slip Op 33759[U], *31).

Since some of the e-mail exchanges had surfaced in other, unrelated EchoStar litigation, but were otherwise unrecoverable in this action, the court concluded that relevant documents had been destroyed by EchoStar.

The court noted that even if the duty to preserve arose only upon the filing of the complaint, EchoStar still violated the duty since it had lost, at a minimum, e-mails from January 24 through January 28, 2008 as the result of the seven-day automatic purge policy.

The court rejected EchoStar's argument that since the parties were seeking an "amicable business solution," no reasonable anticipation of litigation existed, stating "EchoStar's argument ignores the practical reality that parties often engage in settlement discussions before and during litigation, but this does not vitiate the duty to preserve. EchoStar's argument would allow parties to freely shred documents and purge e-mails, simply by faking a willingness to engage in settlement negotiations" (2010 NY Slip Op 33759[U], *35).

The motion court found that EchoStar's failure to preserve electronic data was more than negligent; indeed, it was the same bad faith conduct for which EchoStar had previously been sanctioned (*see Broccoli v EchoStar Communications Corp.*, 229 FRD 506 [D Md 2005]). EchoStar had been on notice of its "substandard document retention practices" at least since the *Broccoli* decision, yet continued those very same practices (2010 NY Slip Op 33759[U], *40). The court determined that EchoStar's conduct, at a minimum, constituted gross negligence. The court found that Voom had demonstrated that the destroyed evidence was relevant to its claims; in any event, relevance is presumed when a party demonstrated gross negligence in the

destruction of evidence. The court ruled that a negative, or adverse inference against EchoStar at trial was an appropriate sanction, rather than striking EchoStar's answer, since other evidence remained available to Voom, including the business records of EchoStar and the testimony of its employees, to prove Voom's claims.[1]

We agree with the motion court that an adverse inference was warranted because EchoStar's spoliation of electronic evidence was the result of gross negligence at the very least, and now affirm.

In *Zubulake*, the court stated that "[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents" (220 FRD at 218). As has been stated,

> "[I]n the world of electronic data, the preservation obligation is not limited simply to avoiding affirmative acts of destruction. Since computer systems generally have automatic deletion features that periodically purge electronic documents such as e-mail, it is necessary for a party facing litigation to take active steps to halt that process" (*Convolve, Inc. v Compaq Computer Corp.*, 223 FRD 162, 175-176 [SD NY 2004]).

Once a party reasonably anticipates litigation, it must, at a minimum, institute an appropriate litigation hold to prevent the routine destruction of electronic data (*see Pension Comm. of Univ. of Montreal Pension Plan*, 685 F Supp 2d at 473).[2] Regardless of its nature, a hold must direct appropriate employees to preserve all relevant records, electronic or otherwise, and create a mechanism for collecting the preserved records so they might be searched by someone other than the employee. The hold should, with as much specificity as possible, describe the ESI at issue,[3] direct that routine destruction policies such as autodelete functions and rewriting over e-mails cease, and describe

---

1. The court noted that had this other evidence not been available, it would have imposed the harsher standard of striking the answer, based on the egregiousness of EchoStar's conduct.

2. While it is the best practice that this litigation hold be in writing, we recognize that there might be certain circumstances, for example, a small company with only a few employees, in which an oral hold would suffice.

3. For example, ESI may exist on employees' home computers, on flash drives or BlackBerrys, in a cloud computing infrastructure or off-site on a remote server or backup tapes.

the consequences for failure to so preserve electronically stored evidence. In certain circumstances, like those here, where a party is a large company, it is insufficient, in implementing such a litigation hold, to vest total discretion in the employee to search and select what the employee deems relevant without the guidance and supervision of counsel (*id*.).[4]

*Zubulake*'s reasonable anticipation trigger for preservation has been widely followed. It has been adopted by courts in all four federal districts of the state (*see Piccone v Town of Webster*, 2010 WL 3516581, *5, 2010 US Dist LEXIS 92409, *13 [WD NY 2010]; *Field Day, LLC v County of Suffolk*, 2010 WL 1286622, *3, 2010 US Dist LEXIS 28476, *10 [ED NY 2010]; *Burgess v Goord*, 2005 WL 1458236, *4 [ND NY 2005]), and by courts throughout the country (*see e.g. Victor Stanley, Inc. v Creative Pipe, Inc.*, 269 FRD 497, 522 [D Md 2010]). Significantly, the Delaware Court of Chancery has adopted the "reasonably anticipated" standard: "Counsel are reminded, however, that the duty to preserve potentially relevant ESI is triggered when litigation is commenced or when litigation is 'reasonably anticipated,' which could occur before litigation is filed" (Delaware Court of Chancery Guidelines for Preservation of Electronically Stored Information, at 2, available at http://courts.delaware.gov/forms/download.aspx?id=50988).

Just recently in *Ahroner v Israel Discount Bank of N.Y.* (79 AD3d 481 [2010]), this Court adopted the *Zubulake* standard when reviewing a motion for spoliation sanctions involving the destruction of electronic evidence. While in *Ahroner* we did not have occasion to address the issue of when a party reasonably anticipates litigation, we cited *Zubulake* favorably in affirming the motion court's determination that a party's destruction of a hard drive was the result of either intentional conduct or gross negligence, warranting an adverse inference.

EchoStar and amicus urge this court to reject the *Zubulake* standard requiring a litigation hold "[o]nce a party reasonably anticipates litigation." EchoStar and amicus insist this standard is vague and unworkable because it provides no guideline for what "reasonably anticipated" means. Instead, EchoStar and amicus believe that "in the absence of 'pending litigation' or 'notice of a specific claim,' defendant should not be sanctioned for discarding items in good faith and pursuant to normal business practices." We disagree. To adopt a rule requiring actual

---

4. *See* Scheindlin, Capra and the Sedona Conference, Electronic Discovery and Digital Evidence: Cases and Materials, at 147-149 (West 2009).

litigation or notice of a specific claim ignores the reality of how business relationships disintegrate. Sides to a business dispute may appear, on the surface, to be attempting to work things out, while preparing frantically for litigation behind the scenes. EchoStar and amicus's approach would encourage parties who actually anticipate litigation, but do not yet have notice of a "specific claim" to destroy their documents with impunity.

EchoStar's arguments that the *Zubulake* standard represents a departure from settled law or that the standard is unworkable are manifestly without merit. The "reasonable anticipation of litigation," as discussed by *Zubulake* and its progeny, is such time when a party is on notice of a credible probability that it will become involved in litigation.

The Sedona Conference has issued guidelines concerning preservation obligations and legal holds (*see* The Sedona Conference, *Commentary on Legal Holds: The Trigger and The Process*, 11 Sedona Conf J 265 [Fall 2010], available at http://www.thesedonaconference.org/content/miscFiles/legal_holds_sept_2010.pdf) (the Sedona Legal Hold Guidelines). These guidelines expressly state that preservation obligations arise "at the point in time when litigation is *reasonably anticipated* whether the organization is the initiator or the target of the litigation" (*id.* at 267 [emphasis added]). Guideline 1 of the Sedona Legal Hold Guidelines further elaborates: "A reasonable anticipation of litigation arises when an organization is on notice of a credible probability that it will become involved in litigation, seriously contemplates initiating litigation, or when it takes specific actions to commence litigation" (*id.* at 269).

██ Under any variant of the standard, EchoStar should have reasonably anticipated litigation as of June 20, 2007, the date it sent a letter to Voom demanding an audit and threatening termination of the contract based on allegations that Voom failed to spend $100 million on the service in 2006. This was especially so given Blum's testimony that EchoStar knew that Voom would sue if EchoStar terminated the agreement.

Further, commencing in June 2007 and continuing through late January 2008, EchoStar repeatedly threatened to terminate the agreement unless Voom tiered its channels. Accordingly, EchoStar should have reasonably anticipated litigation in June 2007, when it advised Voom that it was entitled to terminate the agreement; in November 2007 when EchoStar sent another breach letter, threatening "to terminate the Agreement, effective immediately" if Voom did not tier its channels; on January

28, 2008 when Voom rejected the demand and disputed that EchoStar had a right to terminate the agreement; and, at a minimum, on January 30, 2008, when it formally terminated the agreement.

However, EchoStar did not issue a litigation hold on electronic evidence until *after* this action was commenced. Further, it did not take a snapshot of the relevant e-mail accounts until four days after this action was commenced, and did not cease the automatic destruction of e-mails until four months after this action was commenced.

It is well settled that a party must suspend its automatic-deletion function or otherwise preserve e-mails as part of a litigation hold (*see e.g. Convolve, Inc. v Compaq Computer Corp.*, 223 FRD 162, 176 [SD NY 2004]). Indeed, as noted by the motion court, EchoStar was found guilty of "gross spoliation" of evidence for failing to do so in a prior case (*see Broccoli*, 229 FRD 506 [2005]). It is notable that even after EchoStar had been sanctioned for similar conduct in *Broccoli*, EchoStar, in this case, continued on the same "pre-set path of destruction" (2010 NY Slip Op 33759[U], *31). It is further notable that the e-mail retention policy in *Broccoli* was three times longer in duration than in this case. Thus, incredibly, EchoStar *reduced* the duration of its automatic deletion function in the years following *Broccoli*, deleting e-mails after only seven days instead of after 21 days.

EchoStar points out that it took a snapshot of e-mail accounts four days after the complaint was filed. However, e-mails sent between January 24, 2008 and January 28, 2008 were destroyed without being captured. Moreover, e-mails continued to be automatically deleted for four months after the action was commenced.

In this case, EchoStar's reliance on its employees to preserve evidence "does not meet the standard for a litigation hold" (*see Pension Comm. of Univ. of Montreal Pension Plan*, 685 F Supp 2d at 473; *see also Einstein v 357 LLC*, 2009 NY Slip Op 32784[U], *16, 26 [Sup Ct, NY County 2009] [finding that the failure to suspend deletion policy or to investigate the basic ways in which e-mail was stored constituted a "serious discovery default" rising to the level of gross negligence or willfulness entitling party to an adverse inference; "(Director of IT's) testimony incredibly demonstrates that when litigation commences, the Corcoran IT department takes no steps to prevent users, even those named as parties to such litigation, from delet-

ing potentially relevant emails, relying instead solely upon the discretion of such users to select which emails to save and which to delete"]).

■ A party seeking sanctions based on the spoliation of evidence must demonstrate: (1) that the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a "culpable state of mind"; and finally, (3) that the destroyed evidence was relevant to the party's claim or defense such that the trier of fact could find that the evidence would support that claim or defense (*see Zubulake*, 220 FRD at 220). A "culpable state of mind" for purposes of a spoliation sanction includes ordinary negligence (*id.*; *see also Treppel v Biovail Corp.*, 249 FRD 111, 121 [SD NY 2008]). In evaluating a party's state of mind, *Zubulake* and its progeny provide guidance. Failures which support a finding of gross negligence, when the duty to preserve electronic data has been triggered, include: (1) the failure to issue a written litigation hold, when appropriate; (2) the failure to identify all of the key players and to ensure that their electronic and other records are preserved; and (3) the failure to cease the deletion of e-mail (*see Pension Comm. of Univ. of Montreal Pension Plan*, 685 F Supp 2d at 471).

The intentional or willful destruction of evidence is sufficient to presume relevance, as is destruction that is the result of gross negligence; when the destruction of evidence is merely negligent, however, relevance must be proven by the party seeking spoliation sanctions (*id.* at 467-468).

However, a presumption of relevance is rebuttable:

> "When the spoliating party's conduct is sufficiently egregious to justify a court's *imposition* of a presumption of relevance and prejudice, or when the spoliating party's conduct warrants *permitting* the jury to make such a presumption, the burden then shifts to the spoliating party to rebut that presumption. The spoliating party can do so, for example, by demonstrating that the innocent party had access to the evidence alleged to have been destroyed or that the evidence would not support the innocent party's claims or defenses. If the spoliating party demonstrates to a court's satisfaction that there could not have been any prejudice to the innocent party, then no jury instruction will be warranted, although a lesser sanction might still be required" (*Pension*

*Comm. of Univ. of Montreal Pension Plan* at 468-469).

An adverse inference was a reasonable sanction in light of EchoStar's culpability and the prejudice to Voom. The record shows that EchoStar acted in bad faith in destroying electronically stored evidence. The motion court appropriately considered the *Broccoli* case in determining whether EchoStar was grossly negligent (*see Thibeault v Square D Co.*, 960 F2d 239, 245-246 [1st Cir 1992] [in the course of ordering preclusion, a court should consider all the circumstances surrounding the alleged violation, "includ[ing] events which did not occur in the case proper but occurred in other cases and are, by their nature, relevant to the pending controversy"; to ignore a "pattern of misbehavior . . . would be blinking reality"]). The *Broccoli* case demonstrates that EchoStar was well aware of its preservation obligations and of the problems associated with its automatic deletion of e-mails that could be relevant to litigation to which it was a party. The destruction of e-mails during the critical time when the parties' business relationship was unquestionably deteriorating reflects, at best, gross negligence. Further, the destruction of e-mails after litigation had been commenced, when EchoStar was unquestionably on notice of its duty to preserve, was grossly negligent, if not intentional (*see Zubulake*, 220 FRD at 221).

Since EchoStar acted in bad faith or with gross negligence in destroying the evidence, the relevance of the evidence is presumed and need not have been demonstrated by Voom (*see Sage Realty Corp. v Proskauer Rose*, 275 AD2d 11, 16-17 [2000]), *lv dismissed* 96 NY2d 937 [2001] [dismissal of complaint pursuant to CPLR 3126 warranted where party willfully destroyed evidence; noting "it is the peculiarity of many spoliation cases that the very destruction of the evidence diminishes the ability of the deprived party to prove relevance directly"]; *see also Einstein*, 2009 NY Slip Op 32784[U], *23 ["when a party establishes gross negligence in the destruction of evidence, that fact alone suffices to support a finding that the evidence was unfavorable to the grossly negligent party"] [citations omitted]).

In any event, the record shows that the destroyed evidence was relevant. The "snapshot" e-mails reviewed by the motion court "demonstrat[ed] EchoStar's intention to declare various breaches by V[oom]" as an excuse for terminating the agreement (2010 NY Slip Op 33759[U], *41). These e-mails—a handful only fortuitously recovered, and highly relevant—

certainly permitted the inference that the unrecoverable e-mails, of which the snapshots were but a representative sampling, would have also been relevant.

■ Moreover, the missing evidence prejudiced Voom. Echo-Star argues that the missing e-mails were merely cumulative of other evidence, asserting that since Voom had other means to prove its case, it could not have suffered prejudice from the destruction of e-mails that occurred. This is insufficient to rebut the presumption. Although Voom may have other evidence to point to, the missing evidence is from a crucial time period during which EchoStar appears to have been searching for a way out of its contract. EchoStar's internal communications undoubtedly concerned issues about what it understood the contract to mean, a contract that the motion court has now found to be ambiguous. Evidence from this vital time period is not entirely duplicative of other evidence. The court's imposition of an adverse inference, a lesser sanction than striking of the answer, factored this overlap into account, and reflects an appropriate balancing under the circumstances (*see Ahroner*, 79 AD3d at 482; *see also E.W. Howell Co., Inc. v S.A.F. La Sala Corp.*, 36 AD3d 653, 655 [2007] [negative inference charge was appropriate sanction "where the loss does not deprive the opposing party of the means of establishing a claim or a defense"]; *Melendez v City of New York*, 2 AD3d 170 [2003] [abuse of discretion to strike defendant's answer where the absence of documents was not fatal to plaintiff's case; more appropriate sanction would have been a missing document charge, permitting jurors to draw an inference against defendants on the issue of notice]).

In sum, the motion court's spoliation sanction was appropriate and proportionate. While the court appropriately inferred that the destroyed e-mails would have been relevant to Voom's claims, and that EchoStar's conduct merited a presumption of prejudice, it also recognized that Voom had other available evidence to prove its case.

To the extent that EchoStar was actually negotiating in good faith, which the evidence suggests is doubtful, that does not vitiate the duty to preserve evidence. As the motion court stated, "the practical reality" is that "parties often engage in settlement discussions before and during litigation" and accepting EchoStar's argument "would allow parties to freely shred documents and purge e-mails, simply by faking a willingness to engage in settlement negotiations" (2010 NY Slip Op 33759[U], *35; *see also Rutgerswerke AG v Abex Corp.*, 2002 WL 1203836,

*13, 2002 US Dist LEXIS 9965, *44 [SD NY 2002] [duty to preserve documents exists at time of prelitigation settlement discussions]).

Accordingly, the motion court properly determined that EchoStar should have reasonably anticipated litigation as early as June 2007 and certainly no later than February 1, 2008, the date the complaint was filed; that EchoStar was grossly negligent in failing to implement a litigation hold until after litigation had already been commenced; that EchoStar did not implement an appropriate litigation hold until June 2008, approximately four months after litigation had been commenced; that such failures entitle a finder of fact to presume the relevancy of the destroyed electronic data; and that an adverse inference charge was an appropriate spoliation sanction in light of the above.

No discrete appeal lies from the part of the order that granted Voom's motion to preclude Avram Tucker from testifying as an expert at trial and from introducing his expert report (*Santos v Nicolas*, 65 AD3d 941 [2009]). In any event, it is clear from Tucker's initial report and deposition testimony that he was not going to offer any opinions that he was qualified to offer that were entirely independent of the opinion of Roger Williams, an expert withdrawn by EchoStar on the eve of his deposition.

We have considered EchoStar's remaining contentions and find them unavailing.

Accordingly, the order of the Supreme Court, New York County (Richard B. Lowe, III, J.), entered November 9, 2010, which, insofar as appealed from, granted plaintiff's motions to impose sanctions against defendant for the spoliation of evidence and to bar defendant from calling nonparty Avram Tucker as an expert witness at trial and from introducing his expert report, should be affirmed, with costs.

TOM, J.P., SAXE, CATTERSON and MOSKOWITZ, JJ., concur with MANZANET-DANIELS, J.

Order, Supreme Court, New York County, entered November 9, 2010, affirmed, with costs.

---

Motion for leave to file amicus curiae brief granted. Motion for leave to respond to amicus curiae brief granted.