Order, Supreme Court, New York County (Barbara R. Kapnick, J), entered December 11, 2012, which, insofar as appealed from, granted plaintiffs’ motion for a trial adverse inference instruction against defendants-appellants as a sanction for spoliation of electronic evidence, reversed, on the law and the facts, without costs, and the motion denied.
Plaintiffs are entities that leased aircraft to non-appealing defendant Varig Logística S.A. (VarigLog), a Brazilian cargo airline. In this action, plaintiffs are suing (1) VarigLog, for breach of the aircraft lease agreements and for conversion of the aircraft, and (2) defendants-appellants (collectively, the MP defendants), as owners of VarigLog (a direct subsidiary of one of the MP defendants), on an alter ego theory and also on the theory that the MP defendants’ conduct constituted direct conversion of the aircraft. Plaintiffs originally sued VarigLog on these claims in a Florida action commenced in February 2008. In October 2008, plaintiffs voluntarily discontinued the Florida action (to which the MP defendants were not parties) and commenced this action against VarigLog and the MP defendants.
*429 At issue on this appeal is whether the MP defendants exercised sufficient control over VarigLog during the period from April 1, 2008, until VarigLog’s bankruptcy filing on March 3, 2009,[1] to render the MP defendants—who are not alleged to have failed to meet their obligations to preserve or produce their own documents relevant to this action—liable to sanctions for spoliation based on VarigLog’s loss of its relevant electronically stored information (ESI) during that period.[2] Although VarigLog did not implement a litigation “hold” to preserve its ESI, it did install new information technology systems in March 2008 (the month after plaintiffs commenced the Florida action) that provided for daily, weekly and monthly backing up of its ESI. Plaintiffs adduce no evidence that anyone took steps to defeat these backup systems or otherwise deliberately destroyed ESI relevant to this litigation at any point after April 1, 2008. Unfortunately, however, as a result of computer system crashes that occurred in February and March of 2009, all of VarigLog’s preexisting ESI was destroyed. As previously noted, plaintiffs do not claim that the MP defendants were to blame for these crashes.
After learning of the loss of VarigLog’s ESI, plaintiffs moved for sanctions against both VarigLog and the MP defendants. *430 The motion court granted the motion, striking VarigLog’s answer and ruling that, at trial, the jury will be instructed that it may infer that the lost ESI would have supported the veil-piercing claim against the MP defendants. In summary, the court’s reasoning in imposing the sanction against the MP defendants was as follows: (1) the MP defendants’ control of VarigLog obligated them to see to it that VarigLog preserved evidence relevant to this litigation and, in particular, that VarigLog institute a litigation hold on its ESI; (2) the MP defendants’ failure to ensure that VarigLog implemented a litigation hold constituted gross negligence per se, a ruling that followed Pension Comm. of Univ. of Montreal Pension Plan v Banc of Am. Sec. (685 F Supp 2d 456, 465 [SD NY 2010, Scheindlin, J.] [“the failure to issue a written litigation hold constitutes gross negligence”]); and (3) because VarigLog’s culpability rose to the level of gross negligence, prejudice to plaintiffs could be presumed, consistent with VOOM HD Holdings LLC v EchoStar Satellite L.L.C. (93 AD3d 33, 45 [1st Dept 2012] [“The intentional or willful destruction of evidence is sufficient to presume relevance, as is destruction that is the result of gross negligence”]). Only the MP defendants have appealed.
Under this Court’s jurisprudence: “A party seeking sanctions based on the spoliation of evidence must demonstrate: (1) that the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and finally, (3) that the destroyed evidence was relevant to the [moving] party’s claim or defense such that the trier of fact could find that the evidence would support that claim or defense” (VOOM, 93 AD3d at 45 [internal quotation marks omitted]). Further, “[w]hile discovery determinations rest within the sound discretion of the trial court, the Appellate Division is vested with a corresponding power to substitute its own discretion for that of the trial court, even in the absence of abuse” (Andon v 302-304 Mott St. Assoc., 94 NY2d 740, 745 [2000]; see also Small v Lorillard Tobacco Co., 94 NY2d 43, 52-53 [1999] [“The Appellate Division, as a branch of Supreme Court, is vested with the same discretionary power and may exercise that power, even when there has been no abuse of discretion as a matter of law by the nisi prius court”]; 11 Carmody-Wait 2d § 72:142).
The first issue to be determined is whether, as of April 1, 2008, the MP defendants had sufficient control over VarigLog to trigger a duty on their part to see to it that VarigLog was preserving its ESI relevant to this litigation. We conclude that the record supports the motion court’s determination that the *431 MP defendants had a sufficient degree of control over VarigLog to trigger such a duty. This does not equate to a finding that VarigLog was an alter ego of the MP defendants (which will be the determinative issue on plaintiffs’ claims against the MP defendants, since VarigLog itself has been held liable).[3] Nonetheless, it cannot be ignored that the MP defendants, as the sole shareholders of VarigLog at this time, selected VarigLog’s directors, and the record establishes that, during the period in question, employees and consultants of the MP defendants were closely monitoring VarigLog’s operations and were formulating its business strategy.[4] The MP defendants admit that they could obtain documents from VarigLog upon request. In essence, even if it is true that VarigLog was legally and organizationally distinct from the MP defendants, in view of the latter’s status as sole shareholder, determination of the membership of VarigLog’s board and intimate involvement in directing VarigLog’s business, “there seems to be little doubt that [VarigLog] would have complied with a timely request by [the MP defendants] to preserve its [ESI],” from which we conclude that VarigLog’s ESI was sufficiently under the MP defendants’ “practical control” to trigger “a duty [on their part] to ensure that those materials were adequately preserved” (GenOn Mid-Atl., LLC v Stone & Webster, Inc., 282 FRD 346, 355 [SD NY 2012], affd 2012 WL 1849101, 2012 US Dist LEXIS 70750 [SD NY, May 21, 2012, No. 11 CV 1299 (HB)] [holding that the plaintiff was obligated to ensure that a third-party consultant, which had audited the defendant on the plaintiff’s behalf, preserved information relating to the audit in the consultant’s *432 possession, where litigation relating to the subject matter of the audit was foreseeable]).[5]
While the motion court properly determined that the MP defendants, once they took control of VarigLog, had a duty with regard to the preservation of VarigLog’s ESI, on this record it cannot be said that the MP defendants’ failure to discharge this duty was so egregious as to rise to the level of gross negligence. The motion court’s finding of gross negligence apparently was based on a statement by a federal district court of the Southern District of New York that, when litigation is anticipated, “the failure to issue a written litigation hold constitutes gross negligence because that failure is likely to result in the destruction of relevant information” (Pension Comm., 685 F Supp 2d at 465). To the extent the district court meant by this that failure to institute a litigation hold, in all cases and under all circumstances, constitutes gross negligence per se, the statement has been disapproved by the Second Circuit (see Chin v Port Auth. of N.Y. & N.J., 685 F3d 135, 162 [2d Cir 2012], cert denied 569 US —, 133 S Ct 1724 [2013] [“reject(ing) the notion that a failure to institute a ‘litigation hold’ constitutes gross negligence per se,” and citing Pension Comm, as contrary authority]). The per se rule apparently articulated in Pension Comm., and followed by the motion court, has never, to our knowledge, been adopted by a New York state appellate court.
The facts of this case do not support a finding of gross negligence against the MP defendants. First, the MP defendants did not take control of VarigLog until April 1, 2008, after plaintiffs had commenced suit against VarigLog in Florida the previous February. VarigLog was already represented by counsel in the Florida action, and our attention has not been directed to any evidence tending to show that the MP defendants had reason to believe that VarigLog’s counsel was not giving VarigLog adequate advice and direction concerning the preservation of information relevant to the litigation. Neither are we directed to any evidence suggesting that the MP defendants should have been aware of an inadequacy in this regard at any later time (see GenOn, 282 FRD at 357 [noting, as a factor weighing against a finding that a party (GenOn) was grossly negligent based on the loss of information in the possession of a third-party consultant (FTI), that “GenOn and its counsel may rea *433 sonably have expected that FTI . . . would be aware of the rules governing a party’s discovery conduct”]). Moreover, the MP defendants are conceded to have discharged their responsibility to preserve and produce their own documents in this matter, which negates any inference that they deliberately sought to defeat plaintiffs’ right to disclosure or were reckless as to that possibility (see id. [noting, as another factor weighing against a gross negligence finding against GenOn, that, “whatever GenOn’s shortcomings with respect to FTI’s information may have been, there is no suggestion that GenOn failed to preserve and produce all of its own documents”]; see also Hartford Ins. Co. v Holmes Protection Group, 250 AD2d 526, 527 [1st Dept 1998] [“Gross negligence is conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing” (internal quotation marks omitted)]). Finally, as previously discussed, although the MP defendants had “practical control” of VarigLog during the relevant period, the record establishes that VarigLog was an organization separate from the MP defendants, with its own offices, staff, operations, and computer systems. While employees of the MP defendants apparently were present at VarigLog’s offices from time to time, these MP employees were present at VarigLog as representatives of the MP defendants and did not become VarigLog employees.[6]
Because the record supports, at most, a finding of simple negligence against the MP defendants, plaintiffs must prove that the lost ESI would have supported their claims (see VOOM, 93 AD3d at 45). This they have failed to do.[7] The most important evidence bearing on plaintiffs’ alter ego claims against the MP defendants would be communications between the MP defendants and VarigLog, but plaintiffs have abandoned any contention that the loss of VarigLog’s ESI has deprived them of these communications—for the simple reason that the MP defendants have produced their own ESI embodying these communications. As to VarigLog’s internal emails and email exchanges with the judicial oversight committee, plaintiffs only speculate that these would have provided support for their claim that VarigLog was *434 an alter ego of the MP defendants. Plaintiffs also complain that they have not received a full set of VarigLog’s banking records, but they claim that those they have received “demonstrate[ ] that VarigLog was, indeed (at [the MP defendants’] instruction), indirectly benefitting [the MP defendants] through payments to [their] affiliates.” While proof of additional such payments would appear to be cumulative, information about payments to affiliates of the MP defendants presumably could be obtained through appropriate disclosure requests directed to the MP defendants themselves or, perhaps, VarigLog’s banks. Finally, even if VarigLog had instituted a litigation hold, plaintiffs have presented no evidence that such a “hold” would have saved the relevant ESI from destruction when VarigLog’s entire computer system crashed (without any fault on the part of the MP defendants) in February and March of 2009.
We disagree with the full dissent’s analysis in several respects. In concluding that the MP defendants were grossly negligent, the dissent disclaims reliance on any per se rule, instead asserting that the MP defendants “fail[ed] to take even the most rudimentary steps” to preserve evidence at VarigLog. This ignores the fact that VarigLog—which presumably could have anticipated being sued by plaintiffs before the Florida suit was commenced in February 2008, during the freeze-out of the MP defendants—had a duty to preserve evidence substantially before the MP defendants acquired control in April 2008 or were sued themselves the following October. Throughout the litigation against plaintiffs, VarigLog has been represented by its own U.S. counsel. The MP defendants evidently assumed that these attorneys, before and after the MP defendants took control, had been giving VarigLog employees adequate advice and direction about evidence preservation, and that VarigLog employees had been following that advice. While it appears, on this record, that the MP defendants were negligent to operate under these (in hindsight, too optimistic) assumptions, the failure was not so egregiously irresponsible as to constitute gross negligence. Again, there is no dispute that the MP defendants preserved their own organization’s ESI and other documents relevant to this dispute, which, in our view, largely negates any inference that their culpability rose to the level of gross negligence. The dissent also ignores the fact that, even after the MP defendants acquired control of VarigLog in April 2008, VarigLog remained organizationally distinct from the MP defendants, with its own offices, employees and computer system; there is no evidence that the VarigLog “team” established by the MP defendants, which monitored VarigLog and set its overall business strategy, displaced VarigLog’s own employees. As to *435 prejudice, the dissent simply speculates, without apparent basis in the record, that (1) VarigLog’s documents lost in the crash (to the extent these were not available from other sources, such as the MP defendants) were “directly relevant to the critical [alter ego] issue,” and (2) the imposition of a litigation hold might have saved VarigLog’s ESI from destruction in the crashes.
The partially dissenting justice, although he agrees with us that the record discloses only ordinary negligence by the MP defendants, would remit the matter for a hearing to determine the extent of the prejudice to plaintiffs from the loss of VarigLog’s ESI. While we agree with the partial dissent that ordinary negligence may provide a basis for the imposition of spoliation sanctions, we are mindful that, where “the destruction of evidence is merely negligent, . . . relevance [of the lost material] must be proven by the party seeking spoliation sanctions” (VOOM, 93 AD3d at 45) to satisfy the third prong of the showing required on a motion for such relief.[8] The partial dissent does not dispute that the existing record does not support a finding that VarigLog’s lost ESI would have supported plaintiffs claims against the MP defendants, which are the only claims that remain at issue. The present record is extensive; plaintiffs moved for sanctions in March 2012, more than two years after they learned in January 2010 that VarigLog’s ESI had been lost in computer crashes. Thus, plaintiffs, having had an ample opportunity to attempt to demonstrate the relevance of the lost material to their claims against the MP defendants, instead chose to rely on a presumption (which we have found inapplicable) to satisfy the relevance prong of the showing required on their motion.[9] The partial dissent, while agreeing with our rejection of plaintiffs’ reliance on the presumption, would give plaintiffs another chance to establish relevance through an evi *436 dentiary showing, notwithstanding the extensive litigation that has already taken place on the spoliation issue. We decline to give plaintiffs what would amount to a second bite at the apple.
In sum, given the very weak showing, on this record, that plaintiffs have suffered any prejudice as a result of the MP defendants’ merely negligent failure to see to it that VarigLog instituted a litigation hold, the drastic sanction of an adverse inference instruction telling the jury that the MP defendants were directly responsible for preserving VarigLog’s ESI—which, in a case based on an alter ego claim, is tantamount to granting plaintiffs summary judgment—is not warranted in this case.[10]
Concur—Friedman, J.P, Sweeny and Saxe, JJ.

. Notwithstanding VarigLog’s bankruptcy filing in Brazil, this action has been permitted to proceed against it under Brazilian bankruptcy law. VarigLog and the MP defendants have been represented by separate counsel in this action.

. Plaintiffs do not claim that the MP defendants were in control of VarigLog before April 1, 2008. By way of background, the MP defendants (a group of commonly controlled private equity firms, based in New York, and entities under their control), together with a group of three Brazilian individuals, purchased VarigLog out of a previous Brazilian bankruptcy proceeding in early 2006. As required by Brazilian law, the MP defendants’ Brazilian co-investors owned 80% of the voting stock of the entity that directly owned VarigLog; the remaining 20% was owned by the MP defendants. The Brazilian co-investors exercised their voting control to appoint themselves to three of the four seats on VarigLog’s board of directors. In 2007, a dispute developed between the MP defendants and their Brazilian co-investors over VarigLog’s obligation to repay loans from the MP defendants. Beginning in July 2007, the Brazilian co-investors completely froze the MP defendants out of VarigLog’s offices, facilities and business. Shareholder litigation ensued in Brazil between the Brazilian co-investors and the MP defendants. On February 15, 2007, the Brazilian court issued an order finding the Brazilian co-investors guilty of mismanagement, removing them from VarigLog’s management, and appointing a judicial administrator, who was subsequently replaced by a judicial oversight committee. On April 1, 2008, the Brazilian court removed the Brazilian co-investors as shareholders and appointed one of the MP defendants, as sole remaining shareholder, to manage VarigLog under the supervision of the judicial oversight committee. The judicial oversight committee remained in place until December 9, 2008.

. There is no indication in the record that corporate formalities were not observed from April 1, 2008 through March 3, 2009. Moreover, the record establishes that, during that period: (1) the majority of VarigLog’s five-member board was at all times independent of the MP defendants, with only one director having been an employee of the MP defendants and one having been a sister of a partner in one of the MP entities; (2) no employee of the MP defendants served as a VarigLog officer, although the aforementioned sister of a partner in one of the MP entities was chief executive officer for part of the relevant time; (3) VarigLog had its own staff, offices, operations, and computer systems; and (4) the law firms that have represented VarigLog in the litigation against plaintiffs, both in New York and Florida, have never represented the MP defendants in this matter.

. In arguing that they had no duty with respect to the preservation of VarigLog’s ESI, the MP defendants stress that their control of VarigLog was subject to the supervision of the judicial oversight committee for most of the period in question. However, our attention has not been drawn to any evidence supporting an inference that the judicial oversight committee would have objected to VarigLog’s implementation of standard ESI preservation measures.

. We note that the MP defendants have not denied that it was reasonably foreseeable as of April 1, 2008, that plaintiffs would ultimately sue them in connection with plaintiffs’ disputes with VarigLog. In any event, even after plaintiffs commenced this action against the MP defendants in October 2008, no litigation hold was implemented at VarigLog.

. For example, members of the MP defendants’ VarigLog “team,” to which the dissent refers, continued to use accounts on the MP defendants’ email system rather than switching to accounts on VarigLog’s email system. Significantly, as the MP defendants note, in this litigation, plaintiffs have always dealt with VarigLog and its counsel directly in discovery matters, and have not directed demands for production of documents in VarigLog’s possession to the MP defendants.

. Indeed, plaintiffs do not even claim to have made such a showing, and instead rely on the presumption arising from the gross negligence finding.

. See VOOM, 93 AD3d at 45 (the third element of the showing required on a motion for sanctions is “that the destroyed evidence was relevant to the [moving] party’s claim or defense such that the trier of fact could find that the evidence would support that claim or defense”).

. Again, plaintiffs’ appellate brief does not argue, even in the alternative, that the record demonstrates the relevance of the lost ESI, should we determine that a presumption of relevance should not have been applied against the MP defendants. Contrary to plaintiffs’ conclusory assertion that the motion court “found that the evidence established that the lost documents . . . were relevant,” the motion court’s decision makes clear that it was presuming relevance based on gross negligence. For example, in rejecting the MP defendants’ argument that relevance had not been shown, the court stated: “But as I’ve said, the failure to issue [a] litigation hold constitutes gross negligence. And once there has been an inference of—a presumption of gross negligence, then there is an inference of relevance of the documents.”

. While the dissenting and partially dissenting justices are correct that the adverse inference instruction would be permissive, they overlook the severe prejudice that would accrue to the MP defendants, which are being sued on a theory that VarigLog was their alter ego, if the court were to tell the jury that the MP defendants were responsible for preserving documents in VarigLog’s possession.