Stein, J.
(dissenting). I respectfully dissent. The majority properly relies upon VOOM HD Holdings LLC v EchoStar Satellite L.L.C. (93 AD3d 33, 45 [1st Dept 2012]) for the proposition that a party seeking sanctions for spoliation of evidence must establish three facts: (1) that the party with control over the destroyed evidence had the obligation to preserve it; (2) that the evidence was destroyed with a culpable state of mind; and (3) that the evidence was relevant to — or, in other words, would have supported — the party’s claim. Like the majority, I conclude that the courts below correctly determined that the MatlinPatterson (MP) defendant firms and entities had sufficient control over Varig Logistica S.A. (VarigLog) to trigger a duty to preserve electronically stored information (ESI) and the computer hardware on which it was stored. However, I part ways with the majority over its determination that the MP defendants’ “culpable state of mind” amounted to, at most, simple negligence. I would hold that defendants acted with gross negligence in failing to preserve the ESI.
I further disagree with the majority’s view that relevance is not to be presumed because the evidence was not intentionally or wilfully destroyed. The majority endorses the conclusion of the First Department in VOOM and the case upon which it relies — Zubulake v UBS Warburg LLC (220 FRD 212, 220 [SD NY 2003]) — that, “[w]here the evidence is determined to have been intentionally or wilfully destroyed, the relevancy of the destroyed documents is presumed” (majority op at 547). However, the majority neglects to mention that VOOM further held that “destruction that is the result of gross negligence” also “is sufficient to presume relevance” (VOOM, 93 AD3d at 45). Inasmuch as, under VOOM, the MP defendants’ gross negligence gives rise to a presumption of relevancy, I would remit to the Appellate Division for consideration of whether, in its discretion, a sanction is warranted.
L
The basic facts are largely undisputed and reflected in the record as described by the majority. The MP defendants were “frozen out” of VarigLog’s affairs by Brazilian shareholders *556 with whom they shared ownership of VarigLog’s parent corporation, Volo do Brasil, S.A. (VdB); during that time frame, VarigLog breached its aircraft lease agreements with plaintiffs, leading to the commencement of a now-discontinued Florida action and then this action. Prior to the commencement of this action, one of the MP defendants was granted authority over the “administration and management” of VarigLog by a Brazilian court. Thereafter, VarigLog suffered two computer crashes resulting in the loss of much of the ESI that plaintiffs sought in discovery. After the loss was disclosed, plaintiffs sought sanctions.
Supreme Court — which, as the majority notes, “had presided over and supervised the discovery in the case for several years” (majority op at 552) — determined that the MP defendants’ culpable state of mind amounted to gross negligence, warranting an adverse inference charge at trial. In contrast, the Appellate Division concluded that the record supported only a finding of ordinary negligence and not gross negligence (118 AD3d 428, 432-433 [1st Dept 2014]). Because the Appellate Division reversed the trial court’s factual determination in this regard, our review is limited to a consideration of “which court’s determination more closely comports with the evidence” (Glenbriar Co. v Lipsman, 5 NY3d 388, 392 [2005]). In my view, Supreme Court’s determination does so here.
While I concur with the majority’s basic outline of the underlying facts, I note that the following facts — which were omitted from the majority’s highly selective version — are also relevant to an analysis of which of the determinations below more closely comports with the record. Although the Brazilian shareholders nominally owned 80% of the voting stock in VdB, a Brazilian court concluded that they did not make any financial contribution and “were inserted into the company by [Volo Logistics LLC, an MP defendant (MP Volo)] ... to circumvent” Brazilian aviation law. The MP defendants not only owned an equity stake in VarigLog, but they also advanced capital to VarigLog in the form of loans. The dispute that led to the MP defendants being “frozen out” of VarigLog’s affairs in July 2007 arose when the Brazilian shareholders refused to authorize repayment of the MP defendants’ loans and instead transferred cash to bank accounts owned by VarigLog and located in Switzerland. MP Volo then sued VarigLog for breach of its obligations under the relevant loan agreement in New York, Switzerland and Brazil (see Volo Logistics LLC v Varig *557 Logistica S.A., 51 AD3d 554 [1st Dept 2008]). The parties do not contest that it was as a result of this dispute that the Brazilian shareholders denied the MP defendants access to VarigLog’s offices and systems and prohibited the MP defendants from involvement in VarigLog’s business affairs from July 2007 until April 2008. In litigation commenced in Brazil by the Brazilian shareholders seeking invalidation of the shareholder agreement with the MP defendants, the Brazilian court found that the shareholders had used VarigLog funds during that time for their personal benefit, rather than for the company’s maintenance. It was also during that time frame that VarigLog began to breach its lease agreements with plaintiffs.
Ultimately, the Brazilian court excluded the Brazilian shareholders from having any role in the management and operations of VarigLog, and vested “administration and management” in MP Volo beginning April 1, 2008. MP Volo remained subject to judicial oversight until December 9, 2008, when the judicial administrators were relieved of any further duty to supervise and control MP Volo’s management and administration of VarigLog.[1] Despite the judicial oversight, the Appellate Division, in affirming Supreme Court’s finding of the requisite control, stated that “it cannot be ignored that the MP defendants, as the sole shareholders of VarigLog at this time, selected VarigLog’s directors, and the record establishes that, during the period in question, employees and consultants of the MP defendants were closely monitoring VarigLog’s operations” (118 AD3d at 431 [emphasis added]).
Indeed, during the relevant time frame, Peter Miller, a former principal of defendant MatlinPatterson Global Advisers, LLC, was first president and then a member of VarigLog’s Board of Directors. Chan Lup Wai Ohira, the sister of an MP Volo director, Lap Chan, became president of VarigLog’s Board of Directors immediately after Miller and, from November 24, 2008 through at least October 19, 2011, she was the CEO of VarigLog. Miller was directly involved in the negotiations over the aircraft leases that are in dispute. In fact, he testified at his examination before trial that he told plaintiffs that their planes would be returned once the past-due amounts that VarigLog owed plaintiffs were settled — that is, Miller informed plaintiffs that reaching an agreement on any outstanding *558 amounts that VarigLog owed plaintiffs under the leases was a prerequisite to the physical return of plaintiffs’ planes. Regarding the MP defendants’ day-to-day management of VarigLog, Miller also testified that Lap Chan led a team of MP defendant employees and consultants who worked at VarigLog, including an information technology (IT) consultant. Notably, although VarigLog maintained a separate computer system from the MP defendants, the IT consultant recommended that VarigLog’s IT operating costs be reduced by 60% within three to four months of MP Volo being imbued with authority over the management and administration of VarigLog. To be sure, as the majority states, VarigLog and the MP defendants were represented by separate counsel. However, it is undisputed that, once the MP defendants became responsible for the administration and management of VarigLog, they replaced VarigLog’s counsel, including in the prior New York action (Volo Logistics LLC v Varig Logistica S.A., 51 AD3d 554 [2008], supra).[2]
Significantly, the computer crashes that resulted in the loss of the ESI at issue occurred on February 15, 2009 and March 24, 2009 — approximately 10 to 11 months after the MP defendants obtained control of VarigLog pursuant to the Brazilian court order, four to five months after this action commenced, several months after judicial oversight terminated, and shortly after plaintiff served VarigLog with its first set of requests for the production of documents. As noted by the dissenting Justice at the Appellate Division, it is undisputed that, even “after the first crash occurred, MP . . . took no additional action to ensure the preservation of data going forward” (118 AD3d at 439 [Richter, J., dissenting]). Rather, it hired a company that unsuccessfully attempted to recover the data, and then waited more than 10 months to disclose the fact that the crashes had occurred. Critically, while the MP defendants were “closely monitoring VarigLog’s operations” (118 AD3d at 431), VarigLog failed to maintain the affected disks and applications following the crashes. That is, this case involves not only a failure to preserve electronic data but, even more importantly, the failure *559 to preserve the affected disks and applications involved in the crashes that plaintiffs could have had examined to determine if the ESI could be restored.
IL
As noted above, my primary disagreement with the majority centers on its analysis of the record evidence regarding the MP defendants’ culpable state of mind — i.e., the extent of their negligence. In concluding that the Appellate Division’s finding that defendant’s conduct constituted ordinary negligence, rather than gross negligence, more closely comports with the record, the majority fails to articulate what it actually means by the phrase “gross negligence.”[3] In accordance with this Court’s traditional definition of gross negligence, the proper standard is “the failure to exercise even slight care,” and whether a party’s conduct amounts to gross negligence generally presents a factual question (Food Pageant v Consolidated Edison Co., 54 NY2d 167, 172 [1981]; see also Dalton v Hamilton Hotel Operating Co., 242 NY 481, 487 [1926]). Upon a complete review of the entire record before us, I conclude that the evidence more closely comports with a finding that the MP defendants failed to use even slight care — i.e., that they were grossly negligent.[4]
While VarigLog’s obligations to preserve evidence may have arisen prior to the time the MP defendants acquired control of that company, the data losses in question occurred long after the MP defendants assumed management and administration of VarigLog. Moreover, once the MP defendants’ close monitor *560 ing of VarigLog’s operations commenced, Miller — an employee of the MP defendants — was directly involved in the unsuccessful negotiations between VarigLog and plaintiffs over the leases at issue. Nevertheless, although the MP defendants should have anticipated litigation with plaintiffs at that point, they failed to institute any litigation hold, as the majority concedes.
Furthermore, VarigLog may have had its own, separate computer systems and counsel, but once the MP defendants were authorized to manage VarigLog, their consultant sought to downsize VarigLog’s IT department and the MP defendants replaced VarigLog’s counsel with attorneys of their own choosing, one of whom admittedly failed to consider the possibility of a computer crash. The computer crashes occurred well after this action commenced, after discovery requests were made, and after judicial oversight of VarigLog had terminated. Thus, at the time of the first crash, the MP defendants were administering VarigLog without oversight, yet they took no steps thereafter to ensure the preservation of the remaining data that survived the first crash, despite the fact that litigation was ongoing. Most troubling of all, the hardware and software — the affected “disks and applications” — involved in the crashes were discarded after the second crash without any notice to plaintiffs, thereby “depriv[ing] [plaintiffs] of the opportunity to have their own expert examine the computer to determine if the deleted files could be restored” (Harry Weiss, Inc. v Moskowitz, 106 AD3d 668, 670 [1st Dept 2013]).
Regardless of whether the MP defendants responded to the discovery demands directed at them, the foregoing evidence more closely comports with the trial court’s finding that they were grossly negligent in their oversight of VarigLog’s discovery obligations {see id. at 669-670; see also AJ Holdings Group, LLC v IP Holdings, LLC, 129 AD3d 504, 505 [1st Dept 2015]; Ahroner v Israel Discount Bank of N.Y., 79 AD3d 481, 482 [1st Dept 2010]; see generally Dorchester Fin. Holdings Corp. v Banco BRJ S.A., 304 FRD 178, 182-184 [SD NY 2014]). Therefore, I would reverse the Appellate Division’s finding of ordinary negligence and reinstate the trial court’s finding regarding the level of negligence displayed. The MP defendants’ grossly negligent conduct gives rise to a rebuttable presumption that the spoliated evidence was relevant (see AJ Holdings, 129 AD3d at 505; VOOM, 93 AD3d at 45). Accordingly, inasmuch as the Appellate Division placed the burden on *561 plaintiffs to demonstrate relevance when it should have placed the burden on the MP defendants to disprove it, I would remit to that Court for a determination of whether the MP defendants rebutted the presumption of relevance and, if not, for a discretionary determination of what sanction, if any, is warranted.
Although the issue of relevance should be revisited, I emphasize that it should be considered by the Appellate Division, rather than the trial court. I further take this opportunity to express my disagreement with the majority’s characterization of the Appellate Division’s analysis of relevance as having been performed “without taking into account [plaintiffs’] arguments in that regard, which were contained in [their] appellate brief” (majority op at 554). In my view, the Appellate Division properly considered plaintiffs’ arguments and concluded that plaintiffs incorrectly asserted that “the motion court found that the evidence established that the lost documents . . . were relevant” (118 AD3d at 435 n 9 [internal quotation marks omitted]). Although the Appellate Division correctly concluded that plaintiffs did not attempt to show relevance in the first instance — which would be their burden if the MP defendants’ conduct amounted only to ordinary negligence (see VOOM, 93 AD3d at 45) — plaintiffs argued in their appellate brief that the MP defendants failed to successfully rebut the presumption of relevance of several enumerated categories of documents, by showing how those documents were relevant. The Appellate Division expressly addressed and rejected plaintiffs’ arguments concerning the documents, performing a detailed analysis of the relevance of all of the enumerated categories of documents set forth in plaintiffs’ brief (118 AD3d at 433-434). Thus, I disagree with the majority’s claim — made in an apparent attempt to provide a rationale for remitting this case to the trial court, rather than the Appellate Division — that the Appellate Division “all but ignored [plaintiffs’] arguments” (majority op at 554). However, even if the Appellate Division did overlook plaintiffs’ arguments concerning relevance — which it plainly did not — the correct remedy would be a remittal to that Court, not to the trial court, for consideration of those arguments.
Chief Judge Lippman and Judges Abdus-Salaam and Fahey concur; Judge Stein dissents in an opinion in which Judge Rivera concurs.
*562 Order reversed, with costs, case remitted to Supreme Court, New York County, for further proceedings in accordance with the opinion herein and certified question answered in the negative.

. Approximately three months after judicial oversight terminated, VarigLog filed for bankruptcy.

. Although the majority concludes that “there was no evidence that the MP defendants had reason to believe that VarigLog’s counsel” — hired by the MP defendants — “was not providing VarigLog adequate advice concerning ESI preservation” (majority op at 553), any inquiry in that regard may have revealed cause for concern, given that counsel later conceded that he “did not discuss backing up existing electronic data that was being preserved . . . , nor did the possibility of a computer crash that might eradicate such data enter [his] thinking.”

. In determining the MP defendants’ culpable state of mind, the Appellate Division defined “gross negligence” as “ ‘conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing’ ” (118 AD3d at 433, quoting Hartford Ins. Co. v Holmes Protection Group, 250 AD2d 526, 527 [1st Dept 1998]). As plaintiffs argue, that definition was inapt because it was drawn from an unrelated context involving the rule that contractual waiver of liability for gross negligence is forbidden as a matter of public policy (see Hartford Ins. Co., 250 AD2d at 527; see also Abacus Fed. Sav. Bank v ADT Sec. Servs., Inc., 18 NY3d 675, 683 [2012]).

. Although I believe that the majority has overlooked significant facts in the record that evince the MP defendants’ gross negligence, I agree that the trial court erred in concluding that the failure to institute a litigation hold amounts to gross negligence per se. Rather, “the failure to adopt good preservation practices [is but] one factor [to be considered] in the determination of whether discovery sanctions should issue” (Chin v Port Auth. of N.Y. & N.J., 685 F3d 135, 162 [2012] [internal quotation marks, brackets and citation omitted]).