[713 NYS2d 155]

SAGE REALTY CORPORATION et al., Appellants, v PROSKAUER ROSE L. L. P. et al., Respondents.

First Department, September 7, 2000

APPEARANCES OF COUNSEL

*David P. Land* of counsel, New York City (*Frank H. Penski, Constance M. Boland* and *Michael D. Kestan* on the brief; *Nixon Peabody, L. L. P.,* and *Richard C. Stein,* attorneys), for appellants.

*Leon P. Gold* of counsel, New York City (*Nancy Kilson, David S. Krulwich* and *Robert A. Cohen* on the brief; *Proskauer Rose L. L. P.,* attorneys), *pro se.*

*Elizabeth Storch* of counsel, New York City (*Nicholas H. De Baun* on the brief; *Brown & Wood, L. L. P.,* attorneys), for Nomura Securities International, Inc., respondent.

### OPINION OF THE COURT

Tom, J.

The issue before us is whether plaintiffs intentionally and in bad faith destroyed tape recordings relevant to their claims and, if so, what is the proper remedy for plaintiffs' spoliation of evidence.

Defendant Proskauer was legal counsel for Robert and Melvyn Kaufman in connection with a complex mortgage-backed securities transaction. The Kaufman brothers were principals of plaintiff Sage Realty Corporation and various related real estate entities that are parties to the present action. Defendant Nomura Securities International (NSI) acted as broker-dealer and Proskauer acted as the plaintiffs' legal advisor. The purpose of the transaction was to refinance certain real estate holdings· and to thus acquire new equity capital. The loan portion of the transaction closed on February 9, 1995; the securitization portion of the transaction took place on April 4, 1995. Plaintiffs contend that their goal was to enter into only leasehold, and not fee, mortgages.

In 1996, plaintiffs discharged Proskauer. The discharge led to some initial litigation over Proskauer's retention of its work product documentation (*Matter of Sage Realty Corp. v Proskauer Rose Goetz & Mendelsohn,* 91 NY2d 30), and plaintiffs hired Nixon Peabody. Plaintiffs then sued Proskauer and NSI in the present case, asserting claims sounding in legal malpractice, breach of fiduciary duty and breach of contract, in connection with the terms of the transaction. Generally, plaintiffs, experienced real estate businessmen, contended that

defendants had failed to explain numerous loan documents to plaintiffs, failed to ensure that only leasehold mortgages were created, failed to ensure that the defeasance provisions of the transaction worked as intended, and generally failed to advise, and that Proskauer failed to reveal a putative conflict in that it had represented NSI in another matter. Defendants, though, claim that the fee mortgage and defeasance matters were amply discussed in many conversations with plaintiffs' principals, who were advised of all relevant aspects of the transaction.

Defendants' initial motion for summary judgment was denied pending further discovery. During discovery, defendants demanded production of the tape recordings that are presently in issue. The Kaufmans concede, as they must, that they and other senior executives tape-recorded business discussions with other parties, including their counsel, regarding complex or important matters, with the result that hundreds of tapes were stored in Melvyn Kaufman's office. Among those recordings were tapes pertaining to discussions with defendants regarding this transaction. Obviously, to the extent that defendants' advice to plaintiffs was thus memorialized on tape, that advice has critical importance to the basic thrust of plaintiffs' entire complaint that the necessary advice was not imparted. Apparently, though, plaintiffs were less than willing to release the tapes.

When plaintiffs received the demands during April and May 1999, their first response was that compliance would be unduly burdensome, but that they would try to locate "any non-privileged, relevant recordings of telephone or other conversations specifically responsive to [the] demand." Defendants subsequently had to demand the tapes again, and plaintiffs again responded that they were trying to locate them. During a one-week period at the end of June 1999, on the eve of depositions, three batches of tapes were produced totaling 13 tapes (eventually two more were produced) encompassing 16 conversations. With the exception of one tape, these conversations did not allude to the fee mortgage or defeasance issues that were being litigated, and as to that one, as the IAS Court indicated, Melvyn Kaufman seemed surprised that it even existed. Three tapes recorded conversations with Proskauer employees and two contained conversations with NSI employees. Yet defendants claimed to have had numerous other conversations with plaintiffs. When defendants requested further tapes, plaintiffs' counsel responded that they were not aware of any more.

As a result, Proskauer refused to produce its first witness for depositions. Defendants moved to compel production of all relevant tape recordings, and plaintiffs cross-moved to compel Proskauer to produce purportedly missing work product files. In connection with the motions, Melvyn Kaufman submitted an affidavit averring his familiarity with the legal requirement that relevant evidence may not be destroyed or altered in anticipation of litigation, that plaintiffs and their employees had "extensively, thoroughly and diligently" searched for, and located, over several weeks "all available tape recordings and transcriptions of tape recordings sought by the defendants to be produced to them," and that all tapes had been turned over to counsel. Kaufman also averred that "[t]o the best of my knowledge, no such tape recordings or transcripts were so destroyed or altered. Also, I am not aware of any requested tape recorded conversation not located and produced * * * and therefore, I do not believe any tape was even inadvertently discarded or altered." The IAS Court then directed depositions on the issue whether tapes were altered or destroyed.

After initially failing to respond to interrogatories as to the taping process and who would be knowledgeable, plaintiffs, under court order, provided a very short list of individual names—five besides the Kaufmans. However, they omitted the names of former personnel who had been primarily responsible for filing and maintaining the tapes. The court then ordered a more complete answer, so that plaintiffs now supplied a very long list of names—159—of personnel who might know something, but omitted any description of how each individual might have been involved in recording or filing tapes, or how they could be located, insofar as all addresses and phone numbers were also omitted. At the depositions, plaintiffs' witnesses were directed by counsel not to answer questions regarding whether certain conversations were taped. The dodging and weaving by now was blatant.

Several former employees provided testimony on this issue significantly at variance with plaintiffs' position and especially undermining key aspects of Kaufman's affidavit. Former personnel established that the protocol was to tape all conversations, including telephone conversations. Although one witness described the taping as selective rather than routine, that person recalled that Melvyn had had phone conversations regarding the securitization transaction. Another former employee recalled witnessing Melvyn having numerous phone conversations regarding that transaction, during which the

mortgage of fee interests was discussed, and that she had listened to a dozen, or perhaps fewer, tapes relating to those conversations. Melvyn Kaufman's secretary testified that she had taped "several" conversations on a daily basis during the relevant time period, and that from 1994 to 1996, covering the time period of Proskauer's representation of plaintiffs giving rise to the underlying dispute, 3 or 4 file cabinets, each holding about 100 tapes with more piled on top, were located in Kaufman's office; some of these were Proskauer tapes. To her knowledge, none had been discarded when she left that employment. However, another employee recalled that several tapes were disposed of during the summer of 1999—the coincidence of the timing is, of course, remarkable.

Melvyn Kaufman also was deposed. He admitted extensive taping over a 10-year period, ostensibly as a memory device for him and his brother, and that he intended that all conversations regarding the securitization transaction be recorded. He also admitted that the defeasance provisions, and that the fee not be mortgaged, were of paramount importance, but testified that, nonetheless, only one tape was produced and as to that one, "I don't even know where the hell that came from." He claimed that all such conversations occurred in person, rather than by telephone, and that they were not recorded. He repeated that all relevant tapes were produced and none were destroyed. His "diligent" and "thorough" search took five minutes; he, not counsel, preliminarily determined what was relevant, which is somewhat at variance with his averment that all tapes were provided to counsel. With regard to the important claim in his affidavit regarding preservation of evidence, Kaufman initially testified that he probably had destroyed tapes, some probably relating to the securitization transaction, in 1995 as part of a general housecleaning, but that no tapes were destroyed during the summer of 1999. However, when presented with some of the above noted employee testimony, he admitted going through and discarding many tapes during June 1999 "within a day or two" after sending some tapes to his attorney in response to the discovery demand. About 20 tapes were brought home before being destroyed so that no one could recover them from the office trash. However, he reiterated that these tapes were not relevant to the discovery demand, although he also admitted that no one but him listened to the tapes to establish their contents and relevancy. Nor did plaintiffs seek a protective order or other judicial intervention to isolate only relevant material for purposes of discovery.

On the basis of this testimony, defendants moved to dismiss the complaint insofar as they were severely prejudiced by plaintiffs' spoliation of relevant evidence. In opposition, plaintiffs argued the lack of relevance and, ironically, relied on the absence of evidence that the tapes were relevant. The IAS Court granted defendants' motion, except for the conflict claim that we do not presently reach, and granted defendants' attorneys' fees request. In reaching its conclusion, the IAS Court relied on the uncontroverted evidence noted above, including Kaufman's own testimony, and his admitted conduct of destroying numerous tapes at such a critical point in time without even advising his attorney of such destruction of potential evidence to ascertain its evidentiary value and hence whether the tapes were within the scope of pending discovery orders. This conduct, while not of itself dispositive on the narrow issue of relevance, nevertheless was so highly dubious as to cast doubt on Kaufman's protestations that all relevant information had been disclosed. As a result, the IAS Court rejected plaintiffs' contention that defendants had failed to come forward with adequate evidence establishing that the destroyed evidence, in fact, was relevant to the underlying litigation, a burden rendered impossible to satisfy as a result of plaintiffs' own misconduct.

Whether we review on the basis of the common-law doctrine of spoliation, allowing dismissal when key evidence is destroyed prior to examination by the opposing party, in which case willfulness or bad faith may not be necessary predicates (*see*, *Squitieri v City of New York*, 248 AD2d 201), or on a proper exercise of the court's discretion under CPLR 3126, addressing willful conduct by a nondisclosing party, we agree with the disposition of the IAS Court.

Plaintiffs' main defense to dismissal, in fact to the imposition of any sanctions, is the conclusory claim that the tapes were not relevant to the underlying action and, as such, were not discoverable in the first place. The sheer effrontery of this claim, in view of Kaufman's intentional act of destroying the tapes once disclosure became imminent, is amazing. The likely relevance of the destroyed evidence is easily inferred. Basically uncontroverted evidence established that plaintiffs, as a matter of their own policy, taped important business conversations; plaintiffs admitted that the nature of the loan was crucial to the transaction; evidence established that plaintiffs directed that all phone calls in connection with this transaction be recorded or otherwise memorialized; and that Melvyn Kaufman

was observed discussing these very matters with defendants on the telephone. Although plaintiffs now complain that relevance cannot be established in the absence of the tapes, it is the peculiarity of many spoliation cases that the very destruction of the evidence diminishes the ability of the deprived party to prove relevance directly, so that plaintiffs' objection will not, under these circumstances, impede a finding of relevance (*Sonmez v World on Columbus*, 261 AD2d 199; *Marrocco v General Motors Corp.*, 966 F2d 220, 223).

We also conclude that the destruction of the tapes was done in bad faith, an inference also circumstantially supported by the nature of Kaufman's conduct and the timing (CPLR 3126; *Sonmez v World on Columbus, supra; cf., Christian v City of New York*, 269 AD2d 135). Again, the record clearly supports this conclusion. Evidence by former employees established that "hundreds" of tapes were present in his office when this litigation commenced, and that they no longer existed during the time period the discovery dispute was occurring. Kaufman himself admitted taking home several tapes with the expressed intention of destroying them. This indication of bad faith is buttressed by Kaufman's failure to take even the elementary precaution, knowing that tapes were being sought, of delivering the tapes to counsel or having a third party verify their lack of relevance prior to their destruction. This record also clearly indicates that, given the singularity of this evidence (*see, DiDomenico v C & S Aeromatik Supplies*, 252 AD2d 41), defendants are substantially prejudiced in interposing a defense without it.

CPLR 3126 provides that if a party "wilfully fails to disclose information which the court finds ought to have been disclosed * * * the court may make such orders with regard to the failure or refusal as are just." As such, courts have "broad discretion" that must not be disturbed absent "clear abuse" to impose sanctions under CPLR 3126 when a party intentionally, contumaciously or in bad faith fails to comply with a discovery order or destroys evidence prior to an adversary's inspection (*Puccia v Farley*, 261 AD2d 83, 85; *cf., Hill v Douglas Elliman-Gibbons & Ives*, 256 AD2d 31, *lv granted* 1999 NY App Div LEXIS 5200). We have recognized that under such circumstances, dismissal may be appropriate as a matter of " 'elementary fairness' " (*Kirkland v New York City Hous. Auth.*, 236 AD2d 170, 175), especially when the destruction of the evidence is "reprehensible" (*Hyosung [Am.], Inc. v Woodcrest Fabrics*, 106 AD2d 298, 299, *appeal dismissed* 64 NY2d 934). Al-

though we also have recognized that dismissal may be an excessive remedy where the destroyed evidence is not crucial, with prejudice diminished accordingly (*Atlantic Mut. Ins. Co. v Sea Transfer Trucking Corp.*, 264 AD2d 659), and other courts have not dismissed when evidence was discarded in good faith, pursuant to normal business practices and in the absence of pending litigation or notice of a specific claim (*Conderman v Rochester Gas & Elec. Corp.*, 262 AD2d 1068, 1070), those factors are inapplicable in this case. Rather, dismissal is justified by the deliberate nature of the conduct that effectively impedes the ability of the deprived party to assert a claim or a defense (*Hyosung [Am.], Inc. v Woodcrest Fabrics, supra*; Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C3126:7, at 757-758; 6 Weinstein-Korn-Miller, NY Civil Practice ¶ 3126.04).

Plaintiffs also complain that the IAS Court misapplied the burden of proof. Although the party seeking disclosure has the burden to show willfulness by the nondisclosing party, the latter must demonstrate an excuse for its failure to disclose (*Kami & Sons v Pipe*, 248 AD2d 312; *Van Wert v Green-Pepper*, 151 AD2d 839, 841). Plaintiffs contend that defendants fail to prove their willfulness, and that their excuse adequately satisfies their own responsibility in this regard. Those claims, though, do not comport with the above facts. The excuse, such as it is, is entirely conclusory and even seems contrived to frustrate the discovery request and orders. It was properly rejected by the motion court.

Accordingly, the order of the Supreme Court, New York County (Sheila Abdus-Salaam, J.), entered February 17, 2000, which, to the extent appealed from, granted the motion of defendants Proskauer Rose L. L. P. and Nomura Securities International, Inc. to dismiss the complaint pursuant to CPLR 3126, with the exception of plaintiffs' conflict of interest claims against Proskauer, should be affirmed, with costs.

WILLIAMS, J. P., LERNER, ANDRIAS and FRIEDMAN, JJ., concur.

Order, Supreme Court, New York County, entered February 17, 2000, affirmed, with costs.