(June 5, 2014)

■ Pegasus Aviation I, Inc. et al., Respondents, v Varig Logistica S.A., Defendant, and MatlinPatterson Global Advisers, LLC, et al., Appellants. [987 NYS2d 350]—

Order, Supreme Court, New York County (Barbara R. Kapnick, J.), entered December 11, 2012, which, insofar as appealed from, granted plaintiffs' motion for a trial adverse inference instruction against defendants-appellants as a sanction for spoliation of electronic evidence, reversed, on the law and the facts, without costs, and the motion denied.

Plaintiffs are entities that leased aircraft to non-appealing defendant Varig Logistica S.A. (VarigLog), a Brazilian cargo airline. In this action, plaintiffs are suing (1) VarigLog, for breach of the aircraft lease agreements and for conversion of the aircraft, and (2) defendants-appellants (collectively, the MP defendants), as owners of VarigLog (a direct subsidiary of one of the MP defendants), on an alter ego theory and also on the theory that the MP defendants' conduct constituted direct conversion of the aircraft. Plaintiffs originally sued VarigLog on these claims in a Florida action commenced in February 2008. In October 2008, plaintiffs voluntarily discontinued the Florida action (to which the MP defendants were not parties) and commenced this action against VarigLog and the MP defendants.

At issue on this appeal is whether the MP defendants exercised sufficient control over VarigLog during the period from April 1, 2008, until VarigLog's bankruptcy filing on March 3, 2009,[1] to render the MP defendants—who are not alleged to have failed to meet their obligations to preserve or produce their own documents relevant to this action—liable to sanctions for spoliation based on VarigLog's loss of its relevant electronically stored information (ESI) during that period.[2] Although VarigLog did not implement a litigation "hold" to preserve its ESI, it did install new information technology systems in March 2008 (the month after plaintiffs commenced the Florida action) that provided for daily, weekly and monthly backing up of its ESI. Plaintiffs adduce no evidence that anyone took steps to defeat these backup systems or otherwise deliberately destroyed ESI relevant to this litigation at any point after April 1, 2008. Unfortunately, however, as a result of computer system crashes that occurred in February and March of 2009, all of VarigLog's preexisting ESI was destroyed. As previously noted, plaintiffs do not claim that the MP defendants were to blame for these crashes.

After learning of the loss of VarigLog's ESI, plaintiffs moved for sanctions against both VarigLog and the MP defendants.

---

**1.** Notwithstanding VarigLog's bankruptcy filing in Brazil, this action has been permitted to proceed against it under Brazilian bankruptcy law. VarigLog and the MP defendants have been represented by separate counsel in this action.

**2.** Plaintiffs do not claim that the MP defendants were in control of VarigLog before April 1, 2008. By way of background, the MP defendants (a group of commonly controlled private equity firms, based in New York, and entities under their control), together with a group of three Brazilian individuals, purchased VarigLog out of a previous Brazilian bankruptcy proceeding in early 2006. As required by Brazilian law, the MP defendants' Brazilian co-investors owned 80% of the voting stock of the entity that directly owned VarigLog; the remaining 20% was owned by the MP defendants. The Brazilian co-investors exercised their voting control to appoint themselves to three of the four seats on VarigLog's board of directors. In 2007, a dispute developed between the MP defendants and their Brazilian co-investors over VarigLog's obligation to repay loans from the MP defendants. Beginning in July 2007, the Brazilian co-investors completely froze the MP defendants out of VarigLog's offices, facilities and business. Shareholder litigation ensued in Brazil between the Brazilian co-investors and the MP defendants. On February 15, 2007, the Brazilian court issued an order finding the Brazilian co-investors guilty of mismanagement, removing them from VarigLog's management, and appointing a judicial administrator, who was subsequently replaced by a judicial oversight committee. On April 1, 2008, the Brazilian court removed the Brazilian co-investors as shareholders and appointed one of the MP defendants, as sole remaining shareholder, to manage VarigLog under the supervision of the judicial oversight committee. The judicial oversight committee remained in place until December 9, 2008.

The motion court granted the motion, striking VarigLog's answer and ruling that, at trial, the jury will be instructed that it may infer that the lost ESI would have supported the veil-piercing claim against the MP defendants. In summary, the court's reasoning in imposing the sanction against the MP defendants was as follows: (1) the MP defendants' control of VarigLog obligated them to see to it that VarigLog preserved evidence relevant to this litigation and, in particular, that VarigLog institute a litigation hold on its ESI; (2) the MP defendants' failure to ensure that VarigLog implemented a litigation hold constituted gross negligence per se, a ruling that followed *Pension Comm. of Univ. of Montreal Pension Plan v Banc of Am. Sec.* (685 F Supp 2d 456, 465 [SD NY 2010, Scheindlin, J.] ["the failure to issue a *written* litigation hold constitutes gross negligence"]); and (3) because VarigLog's culpability rose to the level of gross negligence, prejudice to plaintiffs could be presumed, consistent with *VOOM HD Holdings LLC v EchoStar Satellite L.L.C.* (93 AD3d 33, 45 [1st Dept 2012] ["The intentional or willful destruction of evidence is sufficient to presume relevance, as is destruction that is the result of gross negligence"]). Only the MP defendants have appealed.

Under this Court's jurisprudence: "A party seeking sanctions based on the spoliation of evidence must demonstrate: (1) that the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and finally, (3) that the destroyed evidence was relevant to the [moving] party's claim or defense such that the trier of fact could find that the evidence would support that claim or defense" (*VOOM*, 93 AD3d at 45 [internal quotation marks omitted]). Further, "[w]hile discovery determinations rest within the sound discretion of the trial court, the Appellate Division is vested with a corresponding power to substitute its own discretion for that of the trial court, even in the absence of abuse" (*Andon v 302-304 Mott St. Assoc.*, 94 NY2d 740, 745 [2000]; *see also Small v Lorillard Tobacco Co.*, 94 NY2d 43, 52-53 [1999] ["The Appellate Division, as a branch of Supreme Court, is vested with the same discretionary power and may exercise that power, even when there has been no abuse of discretion as a matter of law by the nisi prius court"]; 11 Carmody-Wait 2d § 72:142).

The first issue to be determined is whether, as of April 1, 2008, the MP defendants had sufficient control over VarigLog to trigger a duty on their part to see to it that VarigLog was preserving its ESI relevant to this litigation. We conclude that the record supports the motion court's determination that the

MP defendants had a sufficient degree of control over VarigLog to trigger such a duty. This does not equate to a finding that VarigLog was an alter ego of the MP defendants (which will be the determinative issue on plaintiffs' claims against the MP defendants, since VarigLog itself has been held liable).[3] Nonetheless, it cannot be ignored that the MP defendants, as the sole shareholders of VarigLog at this time, selected VarigLog's directors, and the record establishes that, during the period in question, employees and consultants of the MP defendants were closely monitoring VarigLog's operations and were formulating its business strategy.[4] The MP defendants admit that they could obtain documents from VarigLog upon request. In essence, even if it is true that VarigLog was legally and organizationally distinct from the MP defendants, in view of the latter's status as sole shareholder, determination of the membership of VarigLog's board and intimate involvement in directing VarigLog's business, "there seems to be little doubt that [VarigLog] would have complied with a timely request by [the MP defendants] to preserve its [ESI]," from which we conclude that VarigLog's ESI was sufficiently under the MP defendants' "practical control" to trigger "a duty [on their part] to ensure that those materials were adequately preserved" (*GenOn Mid-Atl., LLC v Stone & Webster, Inc.*, 282 FRD 346, 355 [SD NY 2012], *affd* 2012 WL 1849101, 2012 US Dist LEXIS 70750 [SD NY, May 21, 2012, No. 11 CV 1299 (HB)] [holding that the plaintiff was obligated to ensure that a third-party consultant, which had audited the defendant on the plaintiff's behalf, preserved information relating to the audit in the consultant's

---

3. There is no indication in the record that corporate formalities were not observed from April 1, 2008 through March 3, 2009. Moreover, the record establishes that, during that period: (1) the majority of VarigLog's five-member board was at all times independent of the MP defendants, with only one director having been an employee of the MP defendants and one having been a sister of a partner in one of the MP entities; (2) no employee of the MP defendants served as a VarigLog officer, although the aforementioned sister of a partner in one of the MP entities was chief executive officer for part of the relevant time; (3) VarigLog had its own staff, offices, operations, and computer systems; and (4) the law firms that have represented VarigLog in the litigation against plaintiffs, both in New York and Florida, have never represented the MP defendants in this matter.

4. In arguing that they had no duty with respect to the preservation of VarigLog's ESI, the MP defendants stress that their control of VarigLog was subject to the supervision of the judicial oversight committee for most of the period in question. However, our attention has not been drawn to any evidence supporting an inference that the judicial oversight committee would have objected to VarigLog's implementation of standard ESI preservation measures.

possession, where litigation relating to the subject matter of the audit was foreseeable]).[5]

While the motion court properly determined that the MP defendants, once they took control of VarigLog, had a duty with regard to the preservation of VarigLog's ESI, on this record it cannot be said that the MP defendants' failure to discharge this duty was so egregious as to rise to the level of gross negligence. The motion court's finding of gross negligence apparently was based on a statement by a federal district court of the Southern District of New York that, when litigation is anticipated, "the failure to issue a *written* litigation hold constitutes gross negligence because that failure is likely to result in the destruction of relevant information" (*Pension Comm.*, 685 F Supp 2d at 465). To the extent the district court meant by this that failure to institute a litigation hold, in all cases and under all circumstances, constitutes gross negligence per se, the statement has been disapproved by the Second Circuit (*see Chin v Port Auth. of N.Y. & N.J.*, 685 F3d 135, 162 [2d Cir 2012], *cert denied* 569 US —, 133 S Ct 1724 [2013] ["reject(ing) the notion that a failure to institute a 'litigation hold' constitutes gross negligence *per se*," and citing *Pension Comm.* as contrary authority]). The per se rule apparently articulated in *Pension Comm.*, and followed by the motion court, has never, to our knowledge, been adopted by a New York state appellate court.

The facts of this case do not support a finding of gross negligence against the MP defendants. First, the MP defendants did not take control of VarigLog until April 1, 2008, after plaintiffs had commenced suit against VarigLog in Florida the previous February. VarigLog was already represented by counsel in the Florida action, and our attention has not been directed to any evidence tending to show that the MP defendants had reason to believe that VarigLog's counsel was not giving VarigLog adequate advice and direction concerning the preservation of information relevant to the litigation. Neither are we directed to any evidence suggesting that the MP defendants should have been aware of an inadequacy in this regard at any later time (*see GenOn*, 282 FRD at 357 [noting, as a factor weighing against a finding that a party (GenOn) was grossly negligent based on the loss of information in the possession of a third-party consultant (FTI), that "GenOn and its counsel may rea-

---

**5.** We note that the MP defendants have not denied that it was reasonably foreseeable as of April 1, 2008, that plaintiffs would ultimately sue them in connection with plaintiffs' disputes with VarigLog. In any event, even after plaintiffs commenced this action against the MP defendants in October 2008, no litigation hold was implemented at VarigLog.

sonably have expected that FTI . . . would be aware of the rules governing a party's discovery conduct"]). Moreover, the MP defendants are conceded to have discharged their responsibility to preserve and produce their own documents in this matter, which negates any inference that they deliberately sought to defeat plaintiffs' right to disclosure or were reckless as to that possibility (*see id.* [noting, as another factor weighing against a gross negligence finding against GenOn, that, "whatever GenOn's shortcomings with respect to FTI's information may have been, there is no suggestion that GenOn failed to preserve and produce all of its own documents"]; *see also Hartford Ins. Co. v Holmes Protection Group*, 250 AD2d 526, 527 [1st Dept 1998] ["Gross negligence is conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing" (internal quotation marks omitted)]). Finally, as previously discussed, although the MP defendants had "practical control" of VarigLog during the relevant period, the record establishes that VarigLog was an organization separate from the MP defendants, with its own offices, staff, operations, and computer systems. While employees of the MP defendants apparently were present at VarigLog's offices from time to time, these MP employees were present at VarigLog as representatives of the MP defendants and did not become VarigLog employees.[6]

Because the record supports, at most, a finding of simple negligence against the MP defendants, plaintiffs must prove that the lost ESI would have supported their claims (*see VOOM*, 93 AD3d at 45). This they have failed to do.[7] The most important evidence bearing on plaintiffs' alter ego claims against the MP defendants would be communications between the MP defendants and VarigLog, but plaintiffs have abandoned any contention that the loss of VarigLog's ESI has deprived them of these communications—for the simple reason that the MP defendants have produced their own ESI embodying these communications. As to VarigLog's internal emails and email exchanges with the judicial oversight committee, plaintiffs only speculate that these would have provided support for their claim that VarigLog was

---

**6.** For example, members of the MP defendants' VarigLog "team," to which the dissent refers, continued to use accounts on the MP defendants' email system rather than switching to accounts on VarigLog's email system. Significantly, as the MP defendants note, in this litigation, plaintiffs have always dealt with VarigLog and its counsel directly in discovery matters, and have not directed demands for production of documents in VarigLog's possession to the MP defendants.

**7.** Indeed, plaintiffs do not even claim to have made such a showing, and instead rely on the presumption arising from the gross negligence finding.

an alter ego of the MP defendants. Plaintiffs also complain that they have not received a full set of VarigLog's banking records, but they claim that those they have received "demonstrate[ ] that VarigLog was, indeed (at [the MP defendants'] instruction), indirectly benefitting [the MP defendants] through payments to [their] affiliates." While proof of additional such payments would appear to be cumulative, information about payments to affiliates of the MP defendants presumably could be obtained through appropriate disclosure requests directed to the MP defendants themselves or, perhaps, VarigLog's banks. Finally, even if VarigLog had instituted a litigation hold, plaintiffs have presented no evidence that such a "hold" would have saved the relevant ESI from destruction when VarigLog's entire computer system crashed (without any fault on the part of the MP defendants) in February and March of 2009.

We disagree with the full dissent's analysis in several respects. In concluding that the MP defendants were grossly negligent, the dissent disclaims reliance on any per se rule, instead asserting that the MP defendants "fail[ed] to take even the most rudimentary steps" to preserve evidence at VarigLog. This ignores the fact that VarigLog—which presumably could have anticipated being sued by plaintiffs before the Florida suit was commenced in February 2008, during the freeze-out of the MP defendants—had a duty to preserve evidence substantially before the MP defendants acquired control in April 2008 or were sued themselves the following October. Throughout the litigation against plaintiffs, VarigLog has been represented by its own U.S. counsel. The MP defendants evidently assumed that these attorneys, before and after the MP defendants took control, had been giving VarigLog employees adequate advice and direction about evidence preservation, and that VarigLog employees had been following that advice. While it appears, on this record, that the MP defendants were negligent to operate under these (in hindsight, too optimistic) assumptions, the failure was not so egregiously irresponsible as to constitute gross negligence. Again, there is no dispute that the MP defendants preserved their own organization's ESI and other documents relevant to this dispute, which, in our view, largely negates any inference that their culpability rose to the level of gross negligence. The dissent also ignores the fact that, even after the MP defendants acquired control of VarigLog in April 2008, VarigLog remained organizationally distinct from the MP defendants, with its own offices, employees and computer system; there is no evidence that the VarigLog "team" established by the MP defendants, which monitored VarigLog and set its overall business strategy, displaced VarigLog's own employees. As to

prejudice, the dissent simply speculates, without apparent basis in the record, that (1) VarigLog's documents lost in the crash (to the extent these were not available from other sources, such as the MP defendants) were "directly relevant to the critical [alter ego] issue," and (2) the imposition of a litigation hold might have saved VarigLog's ESI from destruction in the crashes.

The partially dissenting justice, although he agrees with us that the record discloses only ordinary negligence by the MP defendants, would remit the matter for a hearing to determine the extent of the prejudice to plaintiffs from the loss of VarigLog's ESI. While we agree with the partial dissent that ordinary negligence may provide a basis for the imposition of spoliation sanctions, we are mindful that, where "the destruction of evidence is merely negligent, . . . relevance [of the lost material] must be proven by the party seeking spoliation sanctions" (*VOOM*, 93 AD3d at 45) to satisfy the third prong of the showing required on a motion for such relief.[8] The partial dissent does not dispute that the existing record does not support a finding that VarigLog's lost ESI would have supported plaintiff's claims against the MP defendants, which are the only claims that remain at issue. The present record is extensive; plaintiffs moved for sanctions in March 2012, more than two years after they learned in January 2010 that VarigLog's ESI had been lost in computer crashes. Thus, plaintiffs, having had an ample opportunity to attempt to demonstrate the relevance of the lost material to their claims against the MP defendants, instead chose to rely on a presumption (which we have found inapplicable) to satisfy the relevance prong of the showing required on their motion.[9] The partial dissent, while agreeing with our rejection of plaintiffs' reliance on the presumption, would give plaintiffs another chance to establish relevance through an evi-

---

**8.** *See VOOM*, 93 AD3d at 45 (the third element of the showing required on a motion for sanctions is "that the destroyed evidence was relevant to the [moving] party's claim or defense such that the trier of fact could find that the evidence would support that claim or defense").

**9.** Again, plaintiffs' appellate brief does not argue, even in the alternative, that the record demonstrates the relevance of the lost ESI, should we determine that a presumption of relevance should not have been applied against the MP defendants. Contrary to plaintiffs' conclusory assertion that the motion court "found that the evidence established that the lost documents . . . were relevant," the motion court's decision makes clear that it was presuming relevance based on gross negligence. For example, in rejecting the MP defendants' argument that relevance had not been shown, the court stated: "But as I've said, the failure to issue [a] litigation hold constitutes gross negligence. And once there has been an inference of—a presumption of gross negligence, then there is an inference of relevance of the documents."

dentiary showing, notwithstanding the extensive litigation that has already taken place on the spoliation issue. We decline to give plaintiffs what would amount to a second bite at the apple.

In sum, given the very weak showing, on this record, that plaintiffs have suffered any prejudice as a result of the MP defendants' merely negligent failure to see to it that VarigLog instituted a litigation hold, the drastic sanction of an adverse inference instruction telling the jury that the MP defendants were directly responsible for preserving VarigLog's ESI—which, in a case based on an alter ego claim, is tantamount to granting plaintiffs summary judgment—is not warranted in this case.[10] Concur—Friedman, J.P., Sweeny and Saxe, JJ.

Andrias, J., concurs in part and dissents in part in a memorandum as follows: I agree with the majority and the dissent that defendant MatlinPatterson Global Advisers, LLC (MP) exercised a sufficient degree of control over its subsidiary Varig Logistica S.A. (VarigLog) to trigger a duty to preserve VarigLog's electronically stored information (ESI), and that MP's failure to impose a litigation hold was not, in and of itself, gross negligence per se.

I also agree with the majority that upon a contextual assessment of all pertinent facts (*see Chin v Port Auth. of N.Y. & N.J.*, 685 F3d 135, 162 [2d Cir 2012], *cert denied* 569 US —, 133 S Ct 1724 [2013]), MP's failure to discharge its duty did not rise to the level of gross negligence. However, because a court may, in its discretion, impose a spoliation sanction for the negligent destruction of evidence, I disagree with the majority's conclusion that no sanction is warranted, and would remand for a determination as to the extent to which plaintiffs have been prejudiced by the loss of the evidence, and the sanction, if any, that should be imposed.

In *Zubulake v UBS Warburg LLC* (220 FRD 212, 218 [SD NY 2003]), the federal district court held that "[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." In *VOOM HD Holdings LLC v EchoStar Satellite L.L.C.* (93 AD3d 33, 45 [1st Dept 2012]), we adopted the *Zubulake* standard for preservation and held that "[a] party seeking sanctions based

---

**10.** While the dissenting and partially dissenting justices are correct that the adverse inference instruction would be permissive, they overlook the severe prejudice that would accrue to the MP defendants, which are being sued on a theory that VarigLog was their alter ego, if the court were to tell the jury that the MP defendants were responsible for preserving documents in VarigLog's possession.

on the spoliation of evidence must demonstrate: (1) that the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a 'culpable state of mind'; and finally, (3) that the destroyed evidence was relevant to the party's claim or defense such that the trier of fact could find that the evidence would support that claim or defense."

The requisite culpable state of mind can be demonstrated through intentional or willful conduct, gross negligence, or ordinary negligence (*id.*), and the court has "broad discretion in determining what, if any, sanction should be imposed for spoliation of evidence . . . [,] even if the destruction occurred through negligence rather than wilfulness" (*Samaroo v Bogopa Serv. Corp.*, 106 AD3d 713, 714 [2d Dept 2013]).

In determining the appropriate sanction for spoliation, "the court must consider the degree to which the contumacious conduct or destruction of evidence prejudiced the other party" (*Melcher v Apollo Med. Fund Mgt. L.L.C.*, 105 AD3d 15, 23-24 [1st Dept 2013]). As the Court of Appeals stated in *Ortega v City of New York* (9 NY3d 69, 76 [2007]): "New York courts therefore possess broad discretion to provide proportionate relief to the party deprived of the lost evidence, such as precluding proof favorable to the spoliator to restore balance to the litigation, requiring the spoliator to pay costs to the injured party associated with the development of replacement evidence, or employing an adverse inference instruction at the trial of the action. Where appropriate, a court can impose the ultimate sanction of dismissing the action or striking responsive pleadings, thereby rendering a judgment by default against the offending party" (citations omitted).

The majority believes that no sanction is warranted. However, the motion court stated that the lost documents, which included internal emails, communications with a Brazilian court, and bank records, "clearly would be very relevant and important for the plaintiff[s] to prove their case," i.e. that MP controlled and dominated VarigLog, that it used its domination to harm plaintiffs, and that MP's Brazilian court defense is not credible. Even if the destruction of the records was the result of ordinary negligence, a hearing should be held to assess the extent of the prejudice suffered by plaintiffs thereby, and for a determination as to the sanction, if any, that would be appropriate. This includes an adverse inference charge (PJI3d 1:77), which may be an appropriate sanction for the negligent spoliation of evidence (*see Marotta v Hoy*, 55 AD3d 1194 [3d Dept 2008]), even if the evidence destroyed did "not constitute the sole source of

the information and the sole means by which plaintiff c[ould] establish his case" (*Alleva v United Parcel Serv., Inc.*, 112 AD3d 543, 544 [1st Dept 2013]; *Melendez v City of New York*, 2 AD3d 170 [1st Dept 2003]).

In this regard, I disagree with the majority that an adverse instruction would be tantamount to the grant of summary judgment in favor of plaintiff on its alter ego and conversion claims. An adverse inference charge is permissive, allowing, but not requiring the jury to draw negative inferences from the missing evidence, and is not equivalent to a grant of summary judgment.

Richter, J., dissents in a memorandum as follows: I agree with the majority's finding that plaintiffs have demonstrated that defendant MatlinPatterson Global Advisers, LLC and its affiliates (MP Global) exercised enough control over Varig Logistica S.A. (VarigLog) to trigger MP Global's obligation to see that VarigLog took reasonable steps to preserve potentially relevant documents. I part company with the majority's holding as to the extent of MP Global's negligence. I conclude that MP Global's failure to take any meaningful steps to preserve evidence constitutes gross negligence and therefore that the order imposing the sanction of an adverse inference should be affirmed.

The imposition of spoliation sanctions is within the discretion of the motion court and should not be disturbed on appeal absent evidence of an abuse of discretion (*see Fish & Richardson, P.C. v Schindler*, 75 AD3d 219, 220 [1st Dept 2010]; *Talansky v Schulman*, 2 AD3d 355, 361-362 [1st Dept 2003]). Courts "possess broad discretion to provide proportionate relief to the party deprived of the lost evidence" (*Ortega v City of New York*, 9 NY3d 69, 76 [2007]).[1] As observed by the majority, when determining if a sanction is proper, the court must determine if the party seeking the sanction established: "(1) that the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and finally, (3) that the destroyed evidence was relevant to the party's claim" (*VOOM HD Holdings LLC v EchoStar Satellite L.L.C.*, 93 AD3d 33, 45 [1st Dept 2012] [internal quotation marks omitted]). However, the party seeking the sanction need not establish relevance when the destruction of evidence arises from conduct above mere negligence

---

**1.** Even if this Court were to use its own discretion, a standard relied on by the majority, I believe an adverse inference would be the correct sanction. I also note, as does the concurring judge, that an adverse inference is permissive and does not require that the jury draw a negative inference from the absence of evidence.

(*see id.* at 45-46; *Ahroner v Israel Discount Bank of N.Y.*, 79 AD3d 481, 482 [1st Dept 2010]). When the destruction is the result of gross negligence, relevance is presumed (*VOOM*, 93 AD3d at 45-46; *Ahroner*, 79 AD3d at 482).

Here, the motion court acted within its discretion in determining that MP Global's conduct constituted gross negligence. MP Global was in control of VarigLog when this action commenced in October 2008, triggering its obligation to preserve evidence (*see VOOM*, 93 AD3d at 45). Despite the fact that it had control, MP Global took no action to ensure that VarigLog preserved potentially relevant evidence. I do not contend, as the majority suggests, that MP Global's failure to institute a litigation hold at VarigLog constitutes gross negligence per se. Rather, my conclusion is based on MP Global's failure to take even the most rudimentary steps to ensure that potentially relevant evidence was preserved, including, but not limited to, instructing that a litigation hold be put in place.

Although VarigLog experienced two separate computer crashes that affected its hardware and software in 2009, at the time the crashes occurred VarigLog had no policy in place for email retention. Furthermore, there is no evidence that any efforts were made to create copies of the information that now is at issue in case the primary backup data was destroyed. Indeed, the first crash caused the backup tape to become corrupted, and the tape could not be recovered. The second crash, which occurred about a month later, caused damage to VarigLog's backup server, which also could not be restored. Further, the disks and applications involved in the crashes were not retained. Perhaps most notable is the fact that after the first crash occurred, MP Global took no additional action to ensure the preservation of data going forward.

Testimony by employees of VarigLog and MP Global provides further evidence that MP Global did not take the necessary steps to preserve evidence. During her deposition, VarigLog's CEO, Chan Lup Wai Ohira, stated that as far as she knew or could remember, MP Global never made copies of any of VarigLog's computer hard drives. When she was asked if anyone told her at the time she became CEO in November 2008, a month after this action commenced, that she "needed to take special precautions to preserve or retain records," Ohira said no. Additionally, when Santiago Juan Born, a former employee of MP Global and manager of VarigLog, was asked if he ever saw an "instruction from anyone to [VarigLog] telling them to retain their records for the purposes of litigation," his answer also was no.

The majority's focus on the computer crashes does not take any of this into consideration. The crashes would have been irrelevant had MP Global taken any steps to ensure that the evidence was being preserved, such as printing hard copies of the material or taking images of the hard drive. However, MP Global took no such precautions. MP Global does not contend it was unaware of the role electronic evidence would play in litigation. Indeed, MP Global took action to ensure the preservation of its own documents, yet did absolutely nothing to ensure that the VarigLog documents were preserved despite its control of the company. This further supports the conclusion that MP Global's failure to impose a litigation hold at VarigLog was not the result of mere negligence, but arose from a gross disregard of its obligations. Therefore, my finding of gross negligence is based, not only on MP Global's failure to initiate a litigation hold, but on a close review of the specific facts of this case (*see Chin v Port Auth. of N.Y. & N.J.*, 685 F3d 135, 162 [2d Cir 2012] [stating that "a case-by-case approach to the failure to produce relevant evidence, at the discretion of the district court, is appropriate" (internal quotation marks omitted)]).

My determination finds support in this Court's decision in *VOOM*. In that case, we found that several factors can "support a finding of gross negligence," such as "(1) the failure to issue a written litigation hold, when appropriate; (2) the failure to identify all of the key players and to ensure that their electronic and other records are preserved; and (3) the failure to cease the deletion of e-mail" (93 AD3d at 45). The record here indicates a pattern of inaction on the part of MP Global that supports a finding of gross negligence (*see id.*; *see also 915 Broadway Assoc. LLC v Paul, Hastings, Janofsky & Walker, LLP*, 34 Misc 3d 1229[A], 2012 NY Slip Op 50285[U], *9 [Sup Ct, NY County 2012]).

Contrary to MP Global's argument, this Court's affirmance of the motion court's decision will not result in parent corporations routinely being held responsible for the discovery lapses of related companies. My conclusion is based on the unique facts of this case and the significant control MP Global had over VarigLog at the time this action was commenced. Finally, other than disputing the degree of control, MP Global offers no excuse for its failure to ensure that the documents were preserved.

The fact that the companies may have had different computer systems does not undermine the conclusion that MP Global had an obligation to act. In April 2008, a Brazilian court placed MP Global in control of VarigLog's administration and management, and the record shows that MP Global put together the

"team" that ran VarigLog, that the team included MP Global's own employees and consultants and, in one instance, a partner's sister, Ohira, who ultimately became VarigLog's CEO. MP Global could have, at a minimum, inquired about the existence of a litigation hold at VarigLog and directed preservation of the data.

As the loss of potential evidence was the result of MP Global's gross negligence, the relevance of the material is presumed and need not be proven by plaintiffs (*VOOM*, 93 AD3d at 45-46; *Ahroner*, 79 AD3d at 482). I note that, although the majority finds that plaintiffs can only speculate as to the relevance of VarigLog's internal emails, "it is the peculiarity of many spoliation cases that the very destruction of the evidence diminishes the ability of the deprived party to prove relevance directly" (*Sage Realty Corp. v Proskauer Rose*, 275 AD2d 11, 17 [1st Dept 2000], *lv dismissed* 96 NY2d 937 [2001]).[2]

---

2. Although the majority engages in an extended discussion of the absence of prejudice, we do not know what the missing documents would show. However, it is important to note that the categories of destroyed materials are directly relevant to the critical issue in this litigation, which is whether MP Global was an alter ego of VarigLog.