=================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
-----------------------------------------------------------------
No. 153
Pegasus Aviation I, Inc., et al.,
        Appellants,
      v.
Varig Logistica S.A.,
        Defendant,
MatlinPatterson Global Advisers,
LLC, et al.,
        Respondents.



        Richard R. Patch, for appellants.
        Thomas C. Rice, for respondents.







PIGOTT, J.:

        A party that seeks sanctions for spoliation of evidence

must show that the party having control over the evidence

possessed an obligation to preserve it at the time of its

destruction, that the evidence was destroyed with a "culpable

state of mind," and "that the destroyed evidence was relevant to

- 1 -

the party's claim or defense such that the trier of fact could find that the evidence would support that claim or defense" (Voom HD Holdings LLC v Echostar Satellite L.L.C., 93 AD3d 33, 45 [1st Dept 2012], quoting Zubulake v UBS Warburg LLC, 220 FRD 212, 220 [SD NY 2003]).  Where the evidence is determined to have been intentionally or wilfully destroyed, the relevancy of the destroyed documents is presumed (see Zubulake, 220 FRD at 220).  On the other hand, if the evidence is determined to have been negligently destroyed, the party seeking spoliation sanctions must establish that the destroyed documents were relevant to the party's claim or defense (see id.).

On this appeal, we are asked to decide whether the Appellate Division erred in reversing an order of Supreme Court that imposed a spoliation sanction on the defendants.  We hold that it did, and remand the matter to the trial court for a determination as to whether the evidence, which the Appellate Division found to be negligently destroyed, was relevant to the claims asserted against defendants and for the imposition of an appropriate sanction, should the trial court deem, in its discretion, that a sanction is warranted.

I.

In 2005 and 2006, plaintiffs Pegasus Aviation I, Inc., Pegasus Aviation IV, Inc. and Pegasus Aviation V, Inc. (collectively, Pegasus) leased cargo planes to defendant Varig Logistica, S.A. (VarigLog), a Brazilian air cargo company.

Shortly thereafter, the MP defendants[1] purchased VarigLog out of a Brazilian bankruptcy.  In early 2007, a dispute arose between one of the MP defendants (MP Volo) and its Brazilian shareholders concerning the distribution of proceeds from the sale of one of VarigLog's wholly-owned subsidiaries.  In July 2007, the Brazilian shareholders denied the MP defendants access to VarigLog's offices, and shareholder litigation ensued.  The end result was that the MP defendants were, in effect, "frozen out" of VarigLog's affairs from July 2007 until April 1, 2008, when a Brazilian court removed the three Brazilian shareholders and appointed MP Volo to "take over the administration and management" of VarigLog under the supervision of a judicial oversight committee.

During the shareholder litigation, and while the MP defendants were "frozen out" of VarigLog, VarigLog defaulted on its leases with Pegasus.  In February 2008, Pegasus commenced

---

[1] For purposes of background, the MP defendants consist of a group of commonly controlled New York-based firms and entities under their control.  Defendants MatlinPatterson Global Advisers, LLC, MatlinPatterson Global Opportunities Partners II LP, and MatlinPatterson Global Opportunities Partners (Cayman) II LP (collectively, MP Funds) formed defendant Volo Logistics LLC (MP Volo), a Delaware corporation that is a wholly-owned subsidiary of defendant Oskars Investments LTD.  MP Volo and three Brazilian shareholders/co-investors formed Volo do Brasil, S.A. (VdB), a Brazilian corporation, which purchased VarigLog out of a Brazilian bankruptcy proceeding in 2006.  Brazilian aviation law requires that Brazilian citizens or entities must control at least 80% of the voting interest in a Brazilian airline and, as a result, the Brazilian shareholders controlled 80% of the voting interest in VdB while MP Volo owned the remaining 20%.

litigation against only VarigLog in Florida state court for, among other things, breach of the lease agreements.  Later, Pegasus voluntarily discontinued the Florida action and filed suit against both VarigLog and MP in New York County Supreme Court in October 2008.  As relevant here, Pegasus sued VarigLog for breach of contract and conversion, and sought to hold the MP defendants liable for VarigLog's conduct on an alter ego theory. In March 2009, VarigLog filed for bankruptcy.  At all relevant times, VarigLog and the MP defendants were represented by separate counsel.

Pegasus served a notice to produce documents pursuant to CPLR 3120 that, as relevant here, sought electronically stored information (ESI) concerning Pegasus's claims and VarigLog's relationship with the MP defendants.  VarigLog produced some documents in response, but that production was unsatisfactory to Pegasus, particularly with regard to the ESI.

Supreme Court appointed a discovery referee to assist Pegasus and VarigLog in resolving the dispute.  During the first conference, which occurred in January 2010, counsel for VarigLog reported that VarigLog had experienced one or more computer "crashes" that impaired its ability to provide the requested ESI. VarigLog's counsel later explained that between 2000 and 2008, VarigLog did not have a system of preserving emails, that emails were routinely stored on the computers of individual employees and that employee computers were returned empty when an employee

left the company.  Counsel also explained that beginning in March 2008, VarigLog had established a system whereby VarigLog's ESI was backed up on a daily, weekly and monthly basis, but that computer crashes that occurred in February and March 2009 resulted in the loss of much of the ESI, and that data recovery efforts had proven unsuccessful.

Pegasus then moved for the imposition of sanctions against VarigLog and the MP defendants.  It sought an order holding VarigLog in contempt for failing to comply with court orders, striking VarigLog's answer, and imposing a trial adverse inference against the MP defendants for their failure to properly preserve electronic and paper records relevant to the action and within their control, albeit in the possession of their subsidiary, VarigLog.  Pegasus argued that the MP defendants controlled VarigLog and therefore had a duty to impose a "litigation hold" to preserve certain VarigLog paper documents but failed to do so.

Supreme Court granted Pegasus's motion, holding that VarigLog's failure to issue a "litigation hold" amounted to gross negligence as a matter of law, such that the relevance of the missing ESI was presumed.[2]  Supreme Court also found that the MP defendants, having been charged by the Brazilian court with the duty to "manage" and "administer" VarigLog, were in "control" of

---

[2]  VarigLog did not appeal Supreme Court's order and is not a party to this appeal.

VarigLog for purposes of putting a "litigation hold" into place to preserve the ESI, and their failure to do so amounted to gross negligence.  The court therefore struck the answer of VarigLog and imposed a trial adverse inference sanction against the MP defendants with regard to ESI and paper records relevant to the action and within the MP defendants' control.  The MP defendants appealed the order of Supreme Court to the Appellate Division insofar as it granted Pegasus's motion for a trial adverse inference instruction.

A divided Appellate Division reversed insofar as appealed from on the law and the facts and denied Pegasus's motion for a trial adverse inference instruction (118 AD3d 428, 428 [1st Dept 2014]).  The majority held that the record supported Supreme Court's finding that the MP defendants had sufficient control over VarigLog so as to trigger a duty on their part to preserve the ESI, but that it could not be said that their "failure to discharge this duty was so egregious as to rise to the level of gross negligence" (id. at 432).  It rejected Supreme Court's holding that the MP defendants' failure to institute a litigation hold amounted to gross negligence per se, and held that the facts of the case supported, at most, a finding of simple negligence (see id. at 432-434).  Further, according to the majority, because Pegasus failed to prove that the lost ESI would have supported Pegasus's claims, a trial adverse inference sanction could not stand (see id. at 435).

Justice Andrias concurred with the majority on the issue of the MP defendants' control over VarigLog and their duty to preserve the ESI, and also agreed "that upon a contextual assessment of all pertinent facts" the MP defendants' "failure to discharge [their] duty did not rise to the level of gross negligence."  However, in his view, because Supreme Court possessed the discretion to impose a spoliation sanction for negligent destruction of evidence, the matter should have been remanded to Supreme Court "for a determination of the extent to which [Pegasus has] been prejudiced by the loss of the evidence, and the sanction, if any, that should be imposed" (id. at 436-437 [Andrias, J., concurring in part and dissenting in part]).

Justice Richter dissented in full, arguing that the MP defendants' "failure to take any meaningful steps to preserve evidence constitute[d] gross negligence" and that the adverse inference sanction should be affirmed (id. at 438 [Richter, J., dissenting]).  She based her determination not only on the fact that the MP defendants failed to initiate a litigation hold, but also "on a close review of the specific facts of the case" (id. at 440).

The Appellate Division granted Pegasus's motion for leave to appeal, and, in its certified question, asks this Court to determine whether the Appellate Division's order, which

reversed Supreme Court, was properly made.[3]  We answer that question in the negative.

                              II.

          Our state trial courts possess broad discretion to provide proportionate relief to a party deprived of lost or destroyed evidence, including the preclusion of proof favorable to the spoliator to restore balance to the litigation, requiring the spoliator to pay costs to the injured party associated with the development of replacement evidence, or employing an adverse inference instruction at the trial of the action (see Ortega v City of New York, 9 NY3d 69, 76 [2007] [citations omitted]; CPLR 3126 [if a trial court determines that a party has destroyed evidence that "ought to have been disclosed . . . the court may make such orders with regard to the failure or refusal as are just"]).

          Here, the order of the Appellate Division reversed the order of Supreme Court "on the law and facts" (118 AD3d at 428). In its certified question to this Court, the Appellate Division certified that the "determination was made as a matter of law and not in the exercise of discretion."  However, we are not bound by the Appellate Division's characterization in its certification order, and instead "look to see whether the Appellate Division's

---

[3]  Because the Appellate Division focused solely on the destruction of ESI and did not address the issue concerning the paper records, our analysis is similarly limited to the ESI evidence.

decision, regardless of the characterization, nonetheless reflects a discretionary balancing of interests" (Andon v 302-304 Mott Street Assoc., 94 NY2d 740, 745 [2000] [citations omitted]).

The trial court (which had presided over and supervised the discovery in the case for several years) and the Appellate Division reached different conclusions concerning the MP defendants' level of negligence in failing to preserve the ESI. The trial court conducted a review of the facts, determined that the MP defendants exercised sufficient control over VarigLog,[4] and held that the failure of the MP defendants to institute a litigation hold amounted to gross negligence.  On appeal, all five Appellate Division Justices agreed with Supreme Court's assessment that the MP defendants possessed "control" over VarigLog such that it had a duty to preserve the ESI, but the three-Justice majority found that "[t]he facts of this case" did not support a "finding of gross negligence" (118 AD3d at 432).  A fourth Justice made a "contextual assessment of all pertinent facts" and reached the same conclusion (id. at 436 [Andrias, J., concurring in part and dissenting in part]).  The dissenting Justice's conclusion that the MP defendants were grossly

---

[4]  Our utilization of the word "control" for purposes of this opinion is solely in reference to the issue of whether the MP defendants possessed sufficient control over VarigLog so as to trigger a duty on the MP defendants' part to see to it that VarigLog was preserving the ESI.  At the trial of this action, Pegasus will still be required to meet all of the elements of its alter ego cause of action against the MP defendants.

negligent was "based on the unique facts of [the] case and the significant control [the MP defendants] had over VarigLog at the time this action was commenced" (id. at 440 [Richter, J., dissenting]). Thus, whether the MP defendants' "culpable mental state" rose to the level of gross negligence, as opposed to ordinary negligence, constituted differing factual determinations by the trial court and the Appellate Division.

Where the Appellate Division reaches a factual conclusion different from that reached by the trial court, "the scope of our review is limited to determining whether the evidence of record . . . more nearly comports with the trial court's findings or with those of the Appellate Division" (Friedman v State of New York, 67 NY2d 271, 284-285 [1986]). In our view, the record evidence comports more with the Appellate Division majority's findings.

The trial court found that it was the lack of a litigation hold, and not the computer crashes themselves, that resulted in the destruction of the requested documents. However, the trial court incorrectly stated that the MP defendants were part of the Florida litigation, and that once they were, they were required to ensure that a litigation hold was in place, pointing to the fact that because the MP defendants were ordered by the Brazilian court to "manage and administer" VarigLog, the MP defendants were running VarigLog and therefore had the means of implementing a litigation hold. However, in this instance,

the failure to institute a litigation hold did not amount to gross negligence per se, as the trial court held.  Rather, a party's failure to institute a litigation hold is but one factor that a trial court can consider in making a determination as to the alleged spoliator's culpable state of mind.

In contrast to the trial court's reasoning, the Appellate Division majority noted that Pegasus did not adduce evidence that any steps were taken to defeat the computer back-up system in the months leading up to the crashes, nor did Pegasus claim that the MP defendants themselves caused the crashes.  The Appellate Division majority considered a number of factors in reaching its ultimate holding that the MP defendants' conduct in failing to preserve the ESI was not grossly negligent.  Pertinent to that finding was the fact that VarigLog was represented by its own counsel when the MP defendants were brought into the litigation in April 2008, and there was no evidence that the MP defendants had reason to believe that VarigLog's counsel was not providing VarigLog adequate advice concerning ESI preservation. Another factor relied on by the majority was that the MP defendants adequately responded to all of Pegasus's discovery demands directed at them, thus negating any inference that the MP defendants were reckless concerning Pegasus's demands made on them.  Finally, the majority found that notwithstanding the fact that the MP defendants had exercised practical control over VarigLog, the record evidence indicated that VarigLog and the MP

defendants were separate entities, with each possessing their own

offices, staff, operations and computer systems.

These aforementioned facts substantiated the Appellate

Division's ultimate conclusion that, at most, the MP defendants'

failures amounted to "a finding of simple negligence" (118 AD3d

at 432-433). The evidence in the record adequately comports with

the Appellate Division majority's holding.

On this record, we see no reason to disturb the

unanimous finding of the lower courts that the MP defendants had

sufficient control over VarigLog to trigger a duty on its part to

preserve the ESI. Nor is there any basis to disturb the findings

of fact by the Appellate Division that the MP defendants were

negligent in failing to discharge that duty. The Appellate

Division majority erred, however, to the extent that it

determined that Pegasus had not attempted to make a showing of

relevance (118 AD3d at 433, n 7) and chose to conduct its own

analysis of the relevance issue without taking into account

Pegasus's arguments in that regard, which were contained in its

appellate brief.[5] Thus, although the Appellate Division

possesses the authority to make findings of fact that are as

broad as the trial court, in this instance, where it all but

ignored Pegasus's arguments concerning the relevance of the

documents, we conclude that the prudent course of action is to

---

[5] Indeed, Pegasus made a motion to reargue addressing this error, and, rather than granting that motion, the Appellate Division granted Pegasus leave to appeal to this Court.

remit the matter to Supreme Court for a determination as to whether the negligently destroyed ESI was relevant to Pegasus's claims against the MP defendants and, if so, what sanction, if any, is warranted.

Finally, the Appellate Division erroneously stated that a trial adverse inference charge in an alter ego case such as this one would be "tantamount to granting [Pegasus] summary judgment" (118 AD3d at 436).  Such adverse inference charges have been found to be appropriate even in situations where the evidence has been found to have been negligently destroyed (see e.g. Strong v City of New York, 112 AD3d 15, 22-24 [1st Dept 2013] [stating that adverse inference charge at trial "may be appropriate" where the evidence was negligently destroyed]; Marotta v Hoy, 55 AD3d 1194, 1197 [3d Dept 2008] [holding that Supreme Court did not abuse its discretion in determining that the plaintiff was entitled to an adverse inference instruction as a sanction for negligent spoliation]; Tomasello v 64 Franklin, Inc., 45 AD3d 1287, 1288 [4th Dept 2007] [adverse inference charge appropriate sanction for negligent spoliation]).  Contrary to the Appellate Division majority's contention, a trial adverse inference sanction would not be akin to granting summary judgment to Pegasus on its alter ego claim, since such a charge is permissive and can be appropriately tailored by the trial court (see PJI 1:77; see also Gogos v Modell's Sporting Goods, Inc., 87 AD3d 248, 255 [1st Dept 2011]).

Accordingly, the order of the Appellate Division should be reversed, with costs, and the case remitted to Supreme Court for further proceedings in accordance with this opinion and the certified question is answered in the negative.

Pegasus Aviation I, Inc., et al. v Varig Logistica S.A., et al.

No. 153

STEIN, J.(dissenting):

I respectfully dissent.  The majority properly relies upon VOOM HD Holdings LLC v EchoStar Satellite L.L.C. (93 AD3d 33, 45 [1st Dept 2012]), for the proposition that a party seeking sanctions for spoliation of evidence must establish three facts: (1) that the party with control over the destroyed evidence had the obligation to preserve it; (2) that the evidence was destroyed with a culpable state of mind; and (3) that the evidence was relevant to -- or, in other words, would have supported -- the party's claim.  Like the majority, I conclude that the courts below correctly determined that the MP defendant firms and entities had sufficient control over Varig Logistica, S.A. (VarigLog) to trigger a duty to preserve electronically stored information (ESI) and the computer hardware on which it was stored.  However, I part ways with the majority over its determination that the MP defendants' "culpable state of mind" amounted to, at most, simple negligence.  I would hold that defendants acted with gross negligence in failing to preserve the ESI.

I further disagree with the majority's view that relevance is not to be presumed because the evidence was not intentionally or wilfully destroyed.  The majority endorses the

- 1 -

conclusion of the First Department in VOOM and the case upon which it relies -- Zubulake v UBS Warburg LLC (220 FRD 212, 220 [SD NY 2003] -- that, "[w]here the evidence is determined to have been intentionally or wilfully destroyed, the relevancy of the destroyed documents is presumed" (maj. op., at 2).  However, the majority neglects to mention that VOOM further held that "destruction that is the result of gross negligence" also "is sufficient to presume relevance" (VOOM, 93 AD3d at 45).  Inasmuch as, under VOOM, the MP defendants' gross negligence gives rise to a presumption of relevancy, I would remit to the Appellate Division for consideration of whether, in its discretion, a sanction is warranted.

I.

The basic facts are largely undisputed and reflected in the record as described by the majority.  The MP defendants were "frozen out" of VarigLog's affairs by Brazilian shareholders with whom they shared ownership of VarigLog's parent corporation, Volo do Brasil, S.A. (VdB); during that time frame, VarigLog breached its aircraft lease agreements with plaintiffs, leading to the commencement of a now-discontinued Florida action and then this action.  Prior to the commencement of this action, one of the MP defendants was granted authority over the "administration and management" of VarigLog by a Brazilian court.  Thereafter, VarigLog suffered two computer crashes resulting in the loss of much of the ESI that plaintiffs sought in discovery.  After the

loss was disclosed, plaintiffs sought sanctions.

Supreme Court -- which, as the majority notes, "had presided over and supervised the discovery in the case for several years" (maj op., at 9) -- determined that the MP defendants' culpable state of mind amounted to gross negligence, warranting an adverse inference charge at trial. In contrast, the Appellate Division concluded that the record supported only a finding of ordinary negligence and not gross negligence (118 AD3d 428, 432-433 [1st Dept 2014]). Because the Appellate Division reversed the trial court's factual determination in this regard, our review is limited to a consideration of "which court's determination more closely comports with the evidence" (Glenbriar Co. v Lipsman, 5 NY3d 388, 392 [2005]). In my view, Supreme Court's determination does so here.

While I concur with the majority's basic outline of the underlying facts, I note that the following facts -- which were omitted from the majority's highly selective version -- are also relevant to an analysis of which of the determinations below more closely comports with the record. Although the Brazilian shareholders nominally owned 80% of the voting stock in VdB, a Brazilian court concluded that they did not make any financial contribution and "were inserted into the company by [Volo Logistics LLC, an MP defendant] . . . to circumvent" Brazilian aviation law. The MP defendants not only owned an equity stake in VarigLog, but they also advanced capital to VarigLog in the

form of loans.  The dispute that led to the MP defendants being "frozen out" of VarigLog's affairs in July 2007 arose when the Brazilian shareholders refused to authorize repayment of the MP defendants' loans and instead transferred cash to bank accounts owned by VarigLog and located in Switzerland.  MP Volo then sued VarigLog for breach of its obligations under the relevant loan agreement in New York, Switzerland and Brazil (see Volo Logistics LLC v Varig Logistica, S.A., 51 AD3d 554 [1st Dept 2008].  The parties do not contest that it was as a result of this dispute that the Brazilian shareholders denied the MP defendants access to VarigLog's offices and systems and prohibited the MP defendants from involvement in VarigLog's business affairs from July 2007 until April 2008.  In litigation commenced in Brazil by the Brazilian shareholders seeking invalidation of the shareholder agreement with the MP defendants, the Brazilian court found that the shareholders had used VarigLog funds during that time for their personal benefit, rather than for the company's maintenance.  It was also during that time frame that VarigLog began to breach its lease agreements with plaintiffs.

Ultimately, the Brazilian court excluded the Brazilian shareholders from having any role in the management and operations of VarigLog, and vested "administration and management" in MP Volo beginning April 1, 2008.  MP Volo remained subject to judicial oversight until December 9, 2008, when the judicial administrators were relieved of any further duty to

supervise and control MP Volo's management and administration of VarigLog.[1]  Despite the judicial oversight, the Appellate Division, in affirming Supreme Court's finding of the requisite control, stated that "it cannot be ignored that the MP defendants, as the sole shareholders of VarigLog at this time, selected VarigLog's directors, and the record establishes that, during the period in question, employees and consultants of the MP defendants were <u>closely monitoring VarigLog's operations</u>" (118 AD3d at 431 [emphasis added]).

Indeed, during the relevant time frame, Peter Miller, a former principal of defendant MatlinPatterson Global Advisors, LLC, was first president and then a member of VarigLog's Board of Directors.  Chan Lup Wai Ohira, the sister of an MP Volo director, Lap Chan, became president of VarigLog's Board of Directors immediately after Miller and, from November 24, 2008 through at least October 19, 2011, she was the CEO of VarigLog. Miller was directly involved in the negotiations over the aircraft leases that are in dispute.  In fact, he testified at his examination before trial that he told plaintiffs that their planes would be returned once the past due amounts that VarigLog owed plaintiffs were settled -- that is, Miller informed plaintiffs that reaching an agreement on any outstanding amounts that VarigLog owed plaintiffs under the leases was a prerequisite

---

[1] Approximately three months after judicial oversight terminated, VarigLog filed for bankruptcy.

to the physical return of plaintiffs' planes.  Regarding the MP defendants' day-to-day management of VarigLog, Miller also testified that Lap Chan led a team of MP defendant employees and consultants who worked at VarigLog, including an information technology (IT) consultant.  Notably, although VarigLog maintained a separate computer system from the MP defendants, the IT consultant recommended that VarigLog's IT operating costs be reduced by 60% within three to four months of MP Volo being imbued with authority over the management and administration of VarigLog.  To be sure, as the majority states, VarigLog and the MP defendants were represented by separate counsel.  However, it is undisputed that, once the MP defendants became responsible for the administration and management of VarigLog, they replaced VarigLog's counsel, including in the prior New York action (Volo Logistics LLC v Varig Logistica, S.A., 51 AD3d 554, supra).[2]

Significantly, the computer crashes that resulted in the loss of the ESI at issue occurred on February 15, 2009 and March 24, 2009 -- approximately 10 to 11 months after the MP defendants obtained control of VarigLog pursuant to the Brazilian

---

[2]  Although the majority concludes that "there was no evidence that the MP defendants had reason to believe that VarigLog's counsel" -- hired by the MP defendants -- "was not providing VarigLog adequate advice concerning ESI preservation" (maj. op., at 11), any inquiry in that regard may have revealed cause for concern, given that counsel later conceded that he "did not discuss backing up existing electronic data that was being preserved . . ., nor did the possibility of a computer crash that might eradicate such data enter [his] thinking."

court order, four to five months after this action commenced, several months after judicial oversight terminated, and shortly after plaintiff served VarigLog with its first set of requests for the production of documents.  As noted by the dissenting Justice at the Appellate Division, it is undisputed that, even "after the first crash occurred, MP . . . took no additional action to ensure the preservation of data going forward" (118 AD3d at 439 [Richter, J., dissenting]).  Rather, it hired a company that unsuccessfully attempted to recover the data, and then waited more than 10 months to disclose the fact that the crashes had occurred.  Critically, while the MP defendants were "closely monitoring VarigLog's operations" (118 AD3d at 431), VarigLog failed to maintain the affected disks and applications following the crashes.  That is, this case involves not only a failure to preserve electronic data but, even more importantly, the failure to preserve the affected disks and applications involved in the crashes that plaintiffs could have had examined to determine if the ESI could be restored.

## II.

As noted above, my primary disagreement with the majority centers on its analysis of the record evidence regarding the MP defendants' culpable state of mind -- i.e., the extent of their negligence.  In concluding that the Appellate Division's finding that defendant's conduct constituted ordinary negligence, rather than gross negligence, more closely comports with the

record, the majority fails to articulate what it actually means
by the phrase "gross negligence."[3]  In accordance with this
Court's traditional definition of gross negligence, the proper
standard is "the failure to exercise even slight care," and
whether a party's conduct amounts to gross negligence generally
presents a factual question (Food Pageant v Consolidated Edison
Co., 54 NY2d 167, 172 [1981]; see also Dalton v Hamilton Hotel
Operating Co., 242 NY 481, 487 [1926]).  Upon a complete review
of the entire record before us, I conclude that the evidence more
closely comports with a finding that the MP defendants failed to
use even slight care -- i.e., that they were grossly negligent.[4]

    While VarigLog's obligations to preserve evidence may

_____

[3] In determining the MP defendants' culpable state of mind,
the Appellate Division defined "gross negligence" as "'conduct
that evinces a reckless disregard for the rights of others or
smacks of intentional wrongdoing'" (118 AD3d at 433, quoting
Hartford Ins. Co. v Holmes Protection Group, 250 AD2d 526, 527
[1st Dept 1998]).  As plaintiffs argue, that definition was inapt
because it was drawn from an unrelated context involving the rule
that contractual waiver of liability for gross negligence is
forbidden as a matter of public policy (see Hartford Ins., 250
AD2d at 527; see also Abacus Fed. Sav. Bank v ADT Sec. Servs.,
Inc., 18 NY3d 675, 683 [2012]).

[4] Although I believe that the majority has overlooked
significant facts in the record that evince the MP defendants'
gross negligence, I agree that the trial court erred in
concluding that the failure to institute a litigation hold
amounts to gross negligence per se.  Rather, "the failure to
adopt good preservation practices . . . [is but] one factor [to
be considered] in the determination of whether discovery
sanctions should issue" (Chin v Port Auth. of N.Y. & N.J., 685
F3d 135, 162 [2012] [internal quotation marks and citation
omitted]).

have arisen prior to the time the MP defendants acquired control of that company, the data losses in question occurred long after the MP defendants assumed management and administration of VarigLog. Moreover, once the MP defendants' close monitoring of VarigLog's operations commenced, Miller -- an employee of the MP defendants -- was directly involved in the unsuccessful negotiations between VarigLog and plaintiffs over the leases at issue. Nevertheless, although the MP defendants should have anticipated litigation with plaintiffs at that point, they failed to institute any litigation hold, as the majority concedes.

Furthermore, VarigLog may have had its own, separate computer systems and counsel, but once the MP defendants were authorized to manage VarigLog, their consultant sought to downsize VarigLog's IT department and the MP defendants replaced VarigLog's counsel with attorneys of their own choosing, one of whom admittedly failed to consider the possibility of a computer crash. The computer crashes occurred well after this action commenced, after discovery requests were made, and after judicial oversight of VarigLog had terminated. Thus, at the time of the first crash, the MP defendants were administering VarigLog without oversight, yet they took no steps thereafter to ensure the preservation of the remaining data that survived the first crash, despite the fact that litigation was ongoing. Most troubling of all, the hardware and software -- the affected "disks and applications" -- involved in the crashes were

discarded after the second crash without any notice to plaintiffs, thereby "depriv[ing] [plaintiffs] of the opportunity to have their own expert examine the computer to determine if the deleted files could be restored" (Harry Weiss, Inc. v Moskowitz, 106 AD3d 668, 670 [1st Dept 2013]).

Regardless of whether the MP defendants responded to the discovery demands directed at them, the foregoing evidence more closely comports with the trial court's finding that they were grossly negligent in their oversight of VarigLog's discovery obligations (see id. at 669-670; see also AJ Holdings Group, LLC v IP Holdings, LLC, 129 AD3d 504, 505 [1st Dept 2015]; Ahroner v Israel Discount Bank of N.Y., 79 AD3d 481, 482 [1st Dept 2010]; see generally Dorchester Fin. Holdings Corp. v Banco BRJ S.A., 304 FRD 178, 182-184 [SDNY 2014]). Therefore, I would reverse the Appellate Division's finding of ordinary negligence and reinstate the trial court's finding regarding the level of negligence displayed. The MP defendants' grossly negligent conduct gives rise to a rebuttable presumption that the spoliated evidence was relevant (see AJ Holdings, 129 AD3d at 505; VOOM, 93 AD3d at 45). Accordingly, inasmuch as the Appellate Division placed the burden on plaintiffs to demonstrate relevance when it should have placed the burden on the MP defendants to disprove it, I would remit to that court for a determination of whether the MP defendants rebutted the presumption of relevance and, if not, for a discretionary determination of what sanction, if any,

is warranted.

Although the issue of relevance should be revisited, I emphasize that it should be considered by the Appellate Division, rather than the trial court.  I further take this opportunity to express my disagreement with the majority's characterization of the Appellate Division's analysis of relevance as having been performed "without taking into account [plaintiffs'] arguments in that regard, which were contained in [their] appellate brief" (maj. op., at 12).  In my view, the Appellate Division properly considered plaintiffs' arguments and concluded that plaintiffs incorrectly asserted that "the motion court found that the evidence established that the lost documents . . . were relevant" (118 AD3d at 435 n 9 [internal quotation marks omitted]).  Although the Appellate Division correctly concluded that plaintiffs did not attempt to show relevance in the first instance -- which would be their burden if the MP defendants' conduct amounted only to ordinary negligence (see VOOM, 93 AD3d at 45) -- plaintiffs argued in their appellate brief that the MP defendants failed to successfully rebut the presumption of relevance of several enumerated categories of documents, by showing how those documents were relevant.  The Appellate Division expressly addressed and rejected plaintiffs' arguments concerning the documents, performing a detailed analysis of the relevance of all of the enumerated categories of documents set forth in plaintiffs' brief (id. at 433-434).  Thus, I disagree

with the majority's claim -- made in an apparent attempt to
provide a rationale for remitting this case to the trial court,
rather than the Appellate Division -- that the Appellate Division
"all but ignored [plaintiffs'] arguments" (Maj. op, at 12).
However, even if the Appellate Division did overlook plaintiffs'
arguments concerning relevance -- which it plainly did not -- the
correct remedy would be a remittal to that court, not to the
trial court, for consideration of those arguments.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order reversed, with costs, case remitted to Supreme Court, New
York County, for further proceedings in accordance with the
opinion herein and certified question answered in the negative.
Opinion by Judge Pigott.  Chief Judge Lippman and Judges Abdus-
Salaam and Fahey concur.  Judge Stein dissents in an opinion in
which Judge Rivera concurs.


Decided December 15, 2015